**Ex parte Ronald Curtis CHAMBERS.**

**No. 66929.**

Court of Criminal Appeals of Texas, En Banc.

March 4, 1981.

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

This applicant is confined by authority of a judgment that he is guilty of capital murder and that he shall "be punished . . . by Death, according to the law." We affirmed this judgment. *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978), *cert. denied*, 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 584 (1979). This is Chambers' second application for habeas corpus relief. His petition prays four things.

First, it prays that a writ of habeas corpus issue. The writ already has issued. V.A.C.C.P. Article 11.07, Section 2(b):

"Whenever a petition for writ of habeas corpus is filed after final conviction in a felony case, the clerk shall transfer or assign it to the court in which the conviction being challenged was obtained. When the petition is received by that court, a writ of habeas corpus, returnable to the Court of Criminal Appeals, shall issue by operation of law."

Second, it prays that the convicting court conduct a hearing at which proof could be offered. This the convicting court refused to do, and its refusal was correct. Hearings and other fact-finding procedures are required only if there are controverted, previously unresolved issues of fact that are material to the legality of the applicant's

confinement. V.A.C.C.P. Article 11.07, Section 2(d). This petition raises only issues of law, not issues of fact. No hearing was required.

Third, the petition prays a stay of execution. There is no showing that a date for execution has been set; in fact the applicant alleges that he is "awaiting the hearing of sentence." Because of our holding below, no stay will be required.

■ Fourth, the petition prays "such other relief as may be appropriate." We find that the applicant has not shown himself to be entitled to relief by either of the two grounds he advances. Both grounds allege that the trial court erred in conducting the selection of the jury that convicted the applicant.

One ground alleges that the court violated the Sixth and Fourteenth Amendments, as they were construed and applied in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 766 (1968), when it excused Venire Members Hamilton and Chase. The appellant advanced this same ground on appeal, but this court held that it was unnecessary to consider the *Witherspoon* questions because the venire members had been unable to "state under oath that the mandatory penalty of death or imprisonment for life will not affect [their] deliberations on any issue of fact," as V.T.C.A. Penal Code 12.31(b) provides. 568 S.W.2d at 319–320. Subsequently the Supreme Court held that it was error to assume that *Witherspoon* and Section 12.31(b) are independent grounds of exclusion, and that the *Witherspoon* doctrine is violated by the excusing of some venire members who could follow the court's instructions in the charge but who could not take the Section 12.31(b) oath to remain unaffected by the penalty while deliberating. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The Supreme Court reaffirmed the *Witherspoon* doctrine that the State may bar from jury service "those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths," those who are "so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally valid death penalty scheme." 448 U.S. at 51, 100 S.Ct. at 2529. *Adams v. Texas* makes it clear that the Sixth and Fourteenth Amendments will countenance the excusing of some venire members who cannot take the Section 12.31(b) oath, but only those who may be excused under the *Witherspoon* doctrine. This court was in error when it refused to go beyond Section 12.-31(b) in deciding Chambers' appellate challenge to the excusing of Venire Members Hamilton and Chase. Since the State would be disentitled to execute a punishment of death that was imposed by a jury from which members had been excluded in violation of the *Witherspoon* doctrine, *Adams v. Texas, supra,* we now shall take up the *Witherspoon* questions as to these venire members.

■ The record of the voir dire examinations of Hamilton and Chase reveals that they fell into the class of venire members who could neither follow the court's instructions nor take the Section 12.31(b) oath to remain unaffected.[1] The excusing of such venire members was not a violation of the *Witherspoon* doctrine.

---

1. The relevant parts of Hamilton's testimony were:

"Q * * * Will you share with us your feelings on the death penalty?

"A I don't think I believe in it—believe in it.

"Q You don't believe in the death penalty? Okay. That's fine and we have absolutely no quarrel with you; you have a lot of company. Is that your personal feeling that you just are opposed to the death penalty?

"A That's right.

"Q All right. Is this something you've felt for some period of time?

"A Yes.

"Q And may I assume then that because of your personal convictions that under no circumstances would you ever be a party to voting for the death penalty regardless of the facts in the case?

"A I don't think I would.

"Q Well, I have to get a yes or no answer from you on each question that we ask.

"A Right at this point I'd say yes, you know, that I would not, you know, go along with it, that, you know, because maybe later on in years I might change my opinion, but at this time it would be I would not right now.

■ The only other complaint raised in this writ has to do with Venire Member Minicks. She was excused because she worked for the same federal agency that

"Q Very good. In other words, your opinion now is you are opposed to the death penalty and under no circumstances would you personally vote the death penalty, is that correct?

"A That's right.

\* \* \* \* \* \*

"Q \* \* \* [I]s it fair to say that your feelings in opposition to the death penalty are such that they would affect your deliberations on these issues of fact that could result in the death penalty?

"A You mean my answers to them would cause that?

"Q Yes.

"A Yes.

"Q And I assume then that you could not take an oath that the mandatory sentence of death would not affect your deliberations, is that correct?

"A Yes.

\* \* \* \* \* \*

"Q \* \* \* Would your personal feelings against the death penalty prevent you or influence you from answering those questions fairly, in other words, based solely on the evidence?

"A I don't know. You put me on a spot there.

"Q Well, now—

"A See, I know how I feel, but I understand what you're getting at—

\* \* \* \* \* \*

"THE COURT: He's asked you two or three times, lady. I know it's new to you, but can you do it or can't you do it? You said you couldn't, concerned about it.

"MISS HAMILTON: I don't know. I mean do I have to give an answer?

"THE COURT: Yes, ma'am; yes, ma'am.

"MISS HAMILTON: Under those basis probably—I probably wouldn't give the right answer. I mean I just couldn't—I just don't believe in the death penalty and I just couldn't."

The relevant parts of Chase's testimony were:

"Q \* \* \* What are your feelings about the death penalty?

"A Well, I don't agree on the death penalty.

"Q Don't believe in the death penalty?

"A No.

"MR. HUDSON: Judge, I believe she said she didn't agree rather than not believe in it. Note that in the record.

"Q I'm sorry, I thought you said you didn't believe in the death penalty; is that right?

"A Well, I don't agree on it.

"THE COURT: You don't think it's a proper form of punishment?

"MISS CHASE: No.

"THE COURT: All right.

"Q All right. Well, that's fine; nobody has any quarrel with you and we appreciate you telling us. Is this something you've felt for some time?

"A Well, yes—well, yes, for any case, I guess that's the way I feel.

"Q You just don't believe in it, is that right?

"A No.

"Q Okay. Then I assume then from what you're telling me, and this is fine and I appreciate your frankness, from what you're telling me I assume that you could not ever vote to inflict the death penalty, is that correct?

"A I don't—I don't think I would be able to.

"Q I beg your pardon?

"A I don't think I would be able to.

"Q Is your answer no—

"A No.

"Q —you could not? All right. \* \* \*

\* \* \* \* \* \*

"Q Okay. Now, you told me that you do not believe in the death penalty and could not vote for the death penalty, is that correct?

"A I don't—I don't believe in the death penalty.

"Q Well, you say you don't believe—

"A I don't think I could, no.

"Q All right. And I assume then or is it correct that your feelings about the death penalty are such that they would affect you in answering those questions yes knowing that the defendant would get the death penalty if you did? In other words, you could never answer the questions yes knowing that the defendant would get the death penalty, is that right?

"A I don't—I probably wouldn't be able to.

"Q In other words, you think your feelings about the death penalty would keep you from answering those questions yes—

"A Yes.

"Q —knowing that he'd get the death penalty if you did?

"A Yes.

"Q All right. And so just to be sure that I understand you, you could not answer those questions yes because of your feelings that the defendant would get the death penalty, is that correct?

"A Yes.

\* \* \* \* \* \*

"THE COURT: \* \* \* If you answer these three questions yes, that is all of the answers should be yes to each question, knowing that the defendant would receive the death penalty, could you do this?

"MISS CHASE: Probably no, but I really don't know anything about the case. I don't know. Probably no."

employed the father of the appellant's counsel. We held that the trial court abused its discretion in excusing Minicks, but "because there is no showing that appellant did not receive a fair and impartial jury, and because the State exercised only 13 of its 15 peremptory challenges, one of which could have been used to remove prospective juror Minicks, no reversible error is shown." 568 S.W.2d at 321. Subsequently we overruled the holding that error in excusing a juror was "cured" if the State had not exercised all its peremptory challenges in the jury selection procedure in capital cases. *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App., 1980) (pending on rehearing). We did not overrule the alternative holding that "there is no showing that the appellant did not receive a fair and impartial jury . . . ." As the dissenting opinion in *Chambers v. State,* 568 S.W.2d 313, 328, pointed out (at 335), ordinarily the erroneous excusing of Minicks would be deemed harmless.[2] *Valore v. State,* 545 S.W.2d 477, 481 (Tex. Cr.App.1977). Neither the Constitution nor the statutes were violated by the excusing of Minicks. See *Rogers v. State,* 163 Tex.Cr. 260, 261, 289 S.W.2d 923, 924 (1956). Recognizing that *Grijalva* has overruled one holding in *Chambers v. State,* we adhere to the alternative holding that the excusing of Minicks was harmless error.

Relief is denied.

TEAGUE, J., dissents on the basis of *Burns v. Estelle,* 592 F.2d 1297 (5th Cir. 1979).

---

**2.** The dissenting opinion in *Chambers v. State* held, not that the excusing of Minicks alone was reversible error, but that "an overall pattern of jury selection . . . denied . . . due proc-

ess of law." 568 S.W.2d at 332 n. 10. The petition now before us relies on the excusing of Minicks alone, not on a pattern.