**Ex parte Clifton Charles RUSSELL, Jr.**

**No. 69298.**

Court of Criminal Appeals of Texas,
En Banc.

Sept. 17, 19૮ం.

Stan Brown, Abilene, for appellant.

Jorge A. Solis, Dist. Atty., Abilene, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is a post-conviction application for writ of habeas corpus brought under Article 11.07, V.A.C.C.P. *See Ex parte Young*, 418 S.W.2d 824 (Tex.Cr.App.1967).

The applicant was convicted of capital murder in 1980 and his punishment was assessed at death. The death penalty conviction was affirmed by this Court. *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App. 1983). Certiorari was denied by the United States Supreme Court. *Russell v. Texas*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984).

After his date of execution was set, applicant filed his post-conviction habeas corpus application in the convicting court alleging, inter alia, that prospective juror Norman B. Scott was excused by the trial court in violation of the standards required by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

This contention was not raised on direct appeal by the applicant. The voir dire examination of the prospective jurors was not requested to be included in the appellate record. To his habeas application applicant attached the transcription of the voir dire examination of the prospective juror Scott. The convicting court concluded that the application was without merit, recommended denial and ordered the record transmitted to this Court.[1]

The execution was stayed, and the habeas application was filed and set so that applicant's contentions could be considered.

The entire voir dire examination of Scott is set forth with the exception of the background information showing Scott was a retired postman, had previously served on a criminal trial jury which had reached a verdict, and had personally had a civil law suit involving an automobile accident.

The voir dire examination then reflects:

"Q ... The Court told you yesterday morning that this is a death penalty case, possibly. That is, it's a capital, the defendant has been charged with capital murder, and in a capital murder case there are two options for punishment: life imprisonment or death. *Do you have any disagreement with the law that sets aside certain kinds of murders and makes them punishable by death?*

"A *Well, I don't believe in it, no. I don't believe in capital punishment.*

---

1. The trial court found the excerpt of the voir dire examination of Scott was true and correct.

"Q Excuse me; I didn't quite understand you.

"A *I said I didn't believe in capital punishment.*

"Q Okay. Can you tell the judge and tell us, are there certain—Why, particularly—I mean, I'm not questioning your feelings or attitudes—but why in particular you don't believe in it?

"A Well, it doesn't look like to me if a man kills somebody he's getting enough punishment. If they just kill him it's all just over with. If he has to live in this world for forty, fifty years, well, it's more punishment.

"Q *And how long have you felt this way about the death penalty?*

"A Well, for some time. *I've thought about it a lot the last few years.*

"Q *You have given it a great deal of thought?*

"A Yes, ma'am.

"Q Now, you understand—Of course, this is a capital case. It's not automatic or mandatory. But if the jury in a case finds the defendant guilty, then the jury has to go on to the punishment phase, just as when you served on that jury in that robbery case before. In that case, in any case that's not a capital case, the jury has to set a punishment; that is, a certain number of years. In a capital case the jury has to answer some questions. The first question is whether or not the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result. In other words, that it was deliberate and that, from what the defendant was doing, he could reasonably expect that the person would die. Now, do you understand what that question means, what that question would ask the jury to find?

"A Well, no, I don't understand it.

"Q Okay. The jury is going to be asked probably two questions should they find this defendant guilty. Then on the punishment phase there would be more evidence and then the Court will give another charge, and in the charge he is going to ask these questions, and the jury must answer the questions. If the answer is yes it must be unanimous, and if the answer is not it must be—at least ten people must agree that the answer is no. And the first one, basically, asks whether or not the jury believes that whatever it is the defendant did was deliberate and that when he did that he could reasonably expect that death would result; that is, it was deliberate and that, you know, a reasonable person would think that, well, if you did this that somebody would die. And that would be the question.

"The second question would be whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. And that means basically the jury looking at the evidence of the particular case, the evidence of the defendant's past—that is, what has been his conduct in the past—and from that determine whether or not he would be violent in the future.

"And those are the questions that would have to be answered one way or the other, whatever that answer would be. If both answers are yes, then the Court must assess the death penalty. Do you understand that?

"A Yes.

"Q *Now, could you answer those questions, knowing that if you answered them yes that the death penalty would be mandatory?*

"A *I don't believe I could.*

"Q Now, in a criminal case, if it's a capital case, the Court, in order to qualify somebody to sit on the jury, must give a person an oath, and that oath—Besides the regular oath that you take, the juror must state under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact; in other words, the fact that the punishment is mandatory wouldn't bear on your determining the guilt or innocence. *Could you take that oath?*

"A *Not if it meant his death I couldn't.*

"Q So, then, you are saying, then, *the possibility of a death penalty would weigh on your mind and affect your deliberations even on determining whether or not the defendant was guilty?*

"A *Right.*

"Q Therefore, from what you are saying, *I take it that you have some principles,* whether they be religious or conscientious or moral or whatever, *against the death penalty.*

"A *I do.*

"Q *Even if the facts would justify it; that is, if the law allowed for it and the facts would justify it, you still couldn't give it?*

"A I don't believe in taking a man's life, no.

"Q *This,* I take it, *is a very deep-seated and firm conviction that you have?*

"A *That's right.*

"Q Are you sufficiently opposed or against capital punishment to the point that you could not take the law and the evidence without considering the fact that the death penalty might be imposed?

"A Well, I could take the law and the evidence, but when it come to imposing the death penalty, I don't think I could do it.

"Q Would your attitude toward the death penalty, that is, feeling as you do— And understanding, again, Mr. Scott I am not quarreling with your viewpoints; there are lots of different viewpoints. But *would this attitude, this strong feeling that you have toward the death penalty, prevent you from making an impartial decision as to the defendant's guilt.*

"A *Well, I'm afraid it would.*

"Q *Would you automatically vote against the imposition of the death penalty without regard to any evidence that might be developed at the trial?*

"A On this case?

"Q *Or in any case.*

"A *Would I vote against the death penalty?*

"Q *Yes.*

"A *Yes.*

"Q Are you saying that your ideas and your viewpoint is such and your frame of mind is such that *regardless of how horrible the facts might be,* or the circumstances might be of the death, that *you would absolutely unequivocally automatically vote against the death penalty, no matter what the facts were?*

"A *I'm afraid I would.*

"Q *And I take it there is nothing that could cause you to change your mind?*

"A I don't think so. *I don't know what it could be.*

"Q *And that nobody could talk you out of it.*

"A No.

"Q Despite your feelings and the convictions that you have stated, *are you telling the Court that you could not put aside your disbelief in the death penalty and do your duty as a citizen?*

"A *I could do my duty as a citizen as long as it didn't include the death penalty.*

"MISS ELLIOTT: Your Honor, at this time we would challenge this juror for cause both under—I think he has disqualified himself under Witherspoon, under 12.31, and under 35.16.

"MR. BROWN: Your Honor, may I ask him a question?

"THE COURT: Go ahead.

"EXAMINATION BY MR. BROWN:

"Q Mr. Scott, understanding what you have said, that you are opposed to capital punishment, are you actually saying that in any case, no matter what the circumstances were, *no matter what the evidence was, that you would automatically vote against the death penalty?*

"A I'm afraid so. *I just don't believe in it.*

"Q All right. Can you think of any set of circumstances, any type of case—for example, a killing of, say, a young mother and her three children, or whatever the most horrible type of killing that you could imagine would be—can you think of any type of case, any circumstances like that, where you could consider voting for the death penalty?

"A I might consider it, but I don't know whether I could do it or not.

"Q Do you think there could be certain cases where you could consider voting for the death penalty?

"A If somebody killed a small child, it's possible.

"Q Now, in answer to some other questions from Miss Elliott, you stated that you felt like the fact that, if the defendant were convicted of capital murder, that the fact that the mandatory punishment would either be life in prison or the death penalty might affect your deliberations on some issue of fact. Now, are you saying there that—Say you had a murder case where the punishment range was going to be from 5 to 99 years or life, anywhere within that range, and you had a capital murder case where the punishment would either be life in prison or the death penalty. Are you saying that in one of those cases, where the death penalty was not involved, that you would simply vote the way you felt the evidence required you to vote, either guilty or not guilty?

"A Right.

"Q Would you do the same in the other one?

"A In the capital?

"Q Yes. In other words, are you—

"A *I just don't believe in it.*

"Q Are you saying that you would tend to vote not guilty in order to avoid facing the question of capital punishment?

"A *Well, now, it depends on the evidence whether I voted not guilty or not, but as far as me giving a man the death sentence, I don't—I don't believe in it.*

"Q All right. But you have already stated that you could consider the death penalty under certain circumstances, and so now the question is that if you are deliberating as a juror on whether a person is guilty or not guilty of capital murder, would you deliberate any differently on deciding guilty or not guilty just because it's a capital murder?

"A Well, it would be on my mind, but I don't know whether I would or not. It would just depend on the evidence.

"Q Well, do you think, then, that your deliberations would be the same, that—

"A Well, now—

"Q —that you would still follow the law as to—and review the evidence and follow the Court's instructions as to what you are supposed to do?

"A Well, yeah, I'd have to follow the Court's instructions.

"Q All right. So the fact that in case of a conviction there would be a mandatory penalty of either life in prison or the death penalty, that would not cause you to deliberate any differently on deciding whether or not the defendant was guilty or not guilty, would it?

"A Well, no, I could decide if he was guilty or not guilty, yes.

"Q You could decide that. All right. And understanding that you could consider both life in prison as well as the death penalty in certain cases, under certain circumstances, would you be willing to follow the instructions of the Court, to follow the law that is given to you with regard to your deliberations as a juror?

"A *I still don't believe in the death penalty. Now, whether I could follow it or not—If I had to pass judgment on a man and have him killed, I—I don't think I could do it.*

"Q All right. Then does that change anything that you have said earlier, that you could under certain circumstances consider the death penalty; is that right?

"A I could in—like with a child or something like that.

"Q All right.

"A And murders, well, that's—that's possible.

"Q In other words, by saying that you could under certain circumstances consider it, *then that means that you would not automatically vote against the death penalty in every conceivable case; isn't that right?*

"A *I might not, and I may again I might. It depends on the evidence. I'm very much against it, but—who knows?*

"Q All right.

"MR. BROWN: Your Honor, we would object to the challenge for cause to this juror. We believe that he has not been disqualified under Witherspoon, and we would further state that as to 12.31(b) that any literal reading of that would be an unconstitutional limitation upon Witherspoon.

"THE COURT: Do you mean on the extra oath? Are you talking about that?

"MR. BROWN: Yes, your Honor.

"MISS ELLIOTT: Your Honor, this—

"THE COURT: Just a moment, now. The question did not go far enough about this oath.

"You must take an oath, Mr. Scott, that the mandatory penalty of life or death will not affect your deliberations on any issue of fact in the case. Now, can you take that oath?

"THE WITNESS: The life or death penalty will not affect it?

"THE COURT: That the mandatory penalty of life or death will not affect your deliberations on any issue of fact.

"THE WITNESS: Well, I'd say it would affect it.

"THE COURT: It would affect it.

"THE WITNESS: It would affect it if that—

"THE COURT: Are you saying, then, that you cannot take that oath?

"THE WITNESS: I don't think, no.

"THE COURT: Now, that wasn't gone into properly.

"I will overrule your objection.

MR. BROWN: All right. May I state more clearly for the record, your Honor, that we would object to the granting of the State's challenge for cause to this juror on an inability to take the 12.31(b) oath on the grounds that it is our position that if 12.31(b) is followed literally it is impermissibly broader than the Witherspoon test and not allowed. And that is the basis of our objection to the challenge for cause.

"THE COURT: All right.

"Mr. Scott, I will discharge you, and thank you very much for your services.

"THE WITNESS: Do I have to come back tomorrow or—

"THE COURT: No, you're excused. You're through. Thank you." (Emphasis added.)

As can be seen, after the State interrogated the prospective juror it challenged Scott for cause "under Witherspoon, under 12.31, and under 35.16." The court then permitted the defense to inquire. After interrogation the defense objected to the State's challenge for cause, the court then inquired of Scott and overruled the defense objection. Then Scott was excused by the court, thus sustaining the challenge for cause. Neither party asked to further interrogate Scott, nor is complaint now made that the applicant was deprived of his right of interrogation. Scott's "dismissal" was not premature.

In *Witherspoon*, the United States Supreme Court said:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The Court made clear that for the State to do so would violate a defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury. Thus

*Witherspoon* was a limitation upon excusal of jurors.

*Witherspoon's* footnote 21 appeared, however, to hold that prospective jurors may be excluded for cause if they made it

> "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Witherspoon,* supra, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. (Emphasis in original.)

*Witherspoon* did recognize the State's legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate the administration of a State's death penalty scheme.

Nevertheless, the Supreme Court and lower courts referred to the language in said footnote # 21 and similar language in footnote # 9 [2] of *Witherspoon* as setting the standard for judging the proper exclusion of a juror opposed to capital punishment. See, e.g., *Maxwell v. Bishop,* 398 U.S. 262, 265, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221 (1970); *Boulden v. Holman,* 394 U.S. 478, 482, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969); *Hackathorn v. Decker,* 438 F.2d 1363, 1366 (5th Cir.1971); *People v. Washington,* 71 Cal.2d 1061, 1091–1092, 80 Cal.Rptr. 567, 584–585, 458 P.2d 479, 496–497 (1969). Later some other courts stated that a veniremember may be excluded only if he or she would "automatically"

vote against the death penalty, and even then this state of mind must be "unambiguous" or "unmistakably clear." See, e.g., *Burns v. Estelle,* 626 F.2d 396 (5th Cir. 1980).

Texas was no exception. See, e.g., *Grider v. State,* 468 S.W.2d 393 (Tex.Cr.App. 1971); *Perillo v. State,* 656 S.W.2d 78, 79 (Tex.Cr.App.1983), and Texas cases there cited.[3]

The decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), held unconstitutional the manner in which the death penalty was imposed in many states. See *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The reaction in Texas was to enact a new death penalty scheme. See V.T.C.A., Penal Code, § 19.03, Article 37.071, V.A.C.C.P. The constitutionality of the new scheme was upheld in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

V.T.C.A., Penal Code, § 12.31, also provided:

> "(a) An individual adjudged guilty of a capital felony shall be punished by confinement in the Texas Department of Corrections for life or by death.

> "(b) Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

Thereafter, this Court in a number of cases held that a prospective juror in a

---

**2.** Footnote # 9 from *Witherspoon*
"Unless a venireman states *unambiguously* that he would *automatically* vote against the imposition of capital punishment *no matter what the trial might reveal,* it simply cannot be assumed that that is his position."
was cited in *Maxwell,* 389 U.S. at 265, 90 S.Ct. at 1580–1581, and *Boulden,* 394 U.S. at 482, 89 S.Ct. at 1141.

**3.** In *Perillo,* supra, at p. 79, it was written:
"The voir dire examination of those persons who compose the jury panel in a capital mur-

der case is conducted under the most demanding of conditions. This is primarily because the United States Supreme Court has held that the death penalty cannot be carried out if even one prospective juror has been excused on a challenge for cause by the prosecuting attorney when the challenge is based solely upon the venireperson's opposition to the death penalty, unless the opposition resulting from the venireperson's inability to follow the law." (Cases cited omitted.)

capital murder case could be disqualified under either § 12.31(b) or under *Witherspoon*. *Bird v. State*, 692 S.W.2d 65, 74 (Tex.Cr.App.1985).

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the question presented was whether Texas contravened the Sixth and Fourteenth Amendments of the United States Constitution as construed and applied in *Witherspoon* when it excluded members of the venire from jury service because they were unable to state under oath as prescribed by V.T.C.A., Penal Code, § 12.31(b), that the mandatory penalty of death or life imprisonment in a capital murder case would not affect their deliberations on any issue of fact.

The United States Supreme Court reversed the *Adams* conviction and set aside the death penalty imposed holding that *Witherspoon* and said § 12.31(b) may not co-exist as separate and independent bases for excluding prospective jurors so as to permit exclusion under § 12.31(b) on a ground broader than permitted by *Witherspoon*. The Court noted, however, that the State could, consistent with *Witherspoon*, use § 12.31(b) to exclude prospective jurors whose views in capital punishment are such as to make them unable to follow the law or obey their oaths.

Later, in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court discussed *Adams:*

"This Court again examined the *Witherspoon* standard in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). *Adams* involved the Texas capital sentencing scheme, wherein jurors were asked to answer three specific questions put by the trial judge. The court was required to impose the death sentence if each question was answered affirmatively. A Texas statute provided that a prospective capital juror 'shall be disqualified ... unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.' *Id.*, at 42, 100 S.Ct., at 2525, before deciding whether certain jurors had been

properly excluded pursuant to this statute, this Court attempted to discern the proper standard for making such a determination. The Court discussed its prior opinions, noting the *Witherspoon* Court's recognition, in footnote 21, that States retained a 'legitimate interest in obtaining jurors who could follow their instructions and obey their oaths.' 448 U.S., at 44, 100 S.Ct., at 2526. The Court concluded:

" 'This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.' *Id.*, at 45, 100 S.Ct., at 2526 (emphasis added).

The Court went on to hold that *as applied in that case* certain veniremen had been improperly excluded under the Texas statute, because their acknowledgment that the possible imposition of the death penalty would or might 'affect' their deliberations was meant only to indicate that they would be more emotionally involved or would view their task 'with greater seriousness and gravity.' *Id.*, at 49, 100 S.Ct., at 2528. The Court reasoned that such an 'effect' did not demonstrate that the prospective jurors were 'unwilling or unable to obey the law or follow their oaths.'

"The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial. Although this task may be difficult in any event, it is obviously made

more difficult by the fact that the standard applied in *Adams* differs markedly from the language of footnote 21. The tests with respect to sentencing and guilt, originally in two prongs, have been merged; the requirement that a juror may be excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof. In general, the standard has been simplified."

The Supreme Court then discussed why the *Adams* test was preferable. First, the language of *Witherspoon's* footnote 21 cannot be squared with the duties of present-day capital sentencing juries. Second, the languages in *Witherspoon's* footnotes 19 and 21 are dicta, and third, the *Adams* standard is in accord with traditional reasons for excluding jurors and with the circumstances under which such determinations are made.

Further, in *Wainwright v. Witt*, 105 S.Ct. at 852, the Supreme Court wrote:

"*We therefore take this opportunity to clarify our decision in Witherspoon, and to reaffirm the above-quoted standard from Adams as the proper standard* for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' *We note that, in addition to dispensing with Witherspoon's reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'* This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react

when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, *there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.* For reasons that will be developed more fully *infra, this is why deference must be paid to the trial judge who sees and hears the juror.*" (Emphasis added.)

The *Witt* Court also held that a state trial court's decision to disqualify potential jurors because of their view on capital punishment involves a finding of fact to which federal courts must defer in habeas corpus proceedings.

It is clear from *Witt* that a majority of the United States Supreme Court abandoned both *Witherspoon's* substantive standard and its stringent burden of proof requirement. See "The Supreme Court—Leading Cases," 99 Harvard Law Review 120 (November 1985).

After *Adams* and before *Witt*, this Court upheld the excusal of prospective jurors in capital murder cases in light of *Adams* where their views on the death penalty would have prevented or substantially impaired their performance as jurors in accordance with their instructions. See *Bass v. State*, 622 S.W.2d 101, 108 (Tex.Cr.App. 1981); *Williams v. State*, 622 S.W.2d 116, 118 (Tex.Cr.App.1981); *Porter v. State*, 623 S.W.2d 374 (Tex.Cr.App.1981); *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983); *Smith v. State*, 683 S.W.2d 393, 401 (Tex. Cr.App.1984); *Smith v. State*, 676 S.W.2d 379 (Tex.Cr.App.1984). After *Witt* see, e.g., *Phillips v. State*, 701 S.W.2d 875 (Tex. Cr.App.1985); *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985); *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985).

And in *Barney v. State*, supra, it was pointed out that while this Court has only a cold record before it, the trial judge reviewing the answers of a prospective juror had the opportunity to observe the tone of voice and demeanor of the prospective juror in

determining the precise meaning intended. See also *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985); *Bird v. State*, supra; *Garza v. State*, 622 S.W.2d 85 (Tex.Cr.App. 1981). (Opinion on Rehearing); *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972). See also *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978).

With this background it should be observed that on interrogation by the State, prospective juror Scott, early on, made clear his disagreement with the law that provided certain offenses are punishable by death as he didn't "believe in capital punishment"; that he had given it "a great deal of thought" the last few years. He was "afraid" his attitude toward the death penalty "would" prevent him from making an impartial decision on the appellant's guilt, would affect his deliberations on guilt; that he didn't believe that he could answer the questions under Article 37.071, V.A.C.C.P., "Yes" if he knew the death penalty would be mandatory; that even if the facts justified it and the law permitted it, he couldn't give the death penalty, he would automatically vote against the death penalty; that he couldn't take the oath under V.T.C.A., Penal Code, § 12.31(b). Scott further stated he didn't believe in taking a man's life, that it was a very deep-seated and firm conviction, that no one could talk him out of it, and he didn't think there was anything that could cause him to change his mind, that he could do his duty as a citizen as long as it didn't include the death penalty.

It was on this basis the prosecutor challenged for cause on the basis of *Witherspoon*. V.T.C.A., Penal Code, § 12.31, and Article 35.16, V.A.C.C.P.

On interrogation by the appellant Scott stated he didn't believe in the death penalty, and that no matter the circumstances or evidence he was afraid he would automatically vote against the death penalty; that

he might possibly consider the death penalty if somebody killed a small child, that it depended on the evidence whether he voted "not guilty or not" but didn't believe in "the death sentence"; that he could follow the court's instructions and decide the issue of guilt, but still didn't think he could "pass judgment on a man and have him killed"; that he might consider the death penalty "like with a child." When asked if that meant "that you would not automatically vote against the death penalty in every conceivable cause" he answered, "I might not and I may again I might. It depends on the evidence. I'm very much against it, but ... who knows?"

In response to the trial court's questions he said the mandatory penalty of life or death would affect his deliberation on any issue of fact and he couldn't take the oath that it wouldn't.

Considering the entire voir dire examination of Scott and applying the standard of *Adams* reaffirmed in *Witt*, it is clear that Scott's views were such as to prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.[4] In making the determination of the qualification of a juror, great deference is to be given to the decision of the trial judge, who has broad discretion in his rulings in challenges, who was present, heard the tenor of the voice of the prospective juror, his demeanor, etc.

In response to Scott's answers the State challenged him for cause on the basis of "Witherspoon, under 12.31 [5] and under 35.-16."[6] After further interrogation of Scott by appellant, his counsel objected to "the challenge for cause ... that he has not been disqualified under Witherspoon, and we would further state that as to 12.31(b) that any literal reading of that would be an unconstitutional limitation upon Witherspoon." The court, not satisfied that the

---

**4.** Article 35.22, V.A.C.C.P. (Oath to Jury):

"When the jury has been selected, the following oath shall be administered them by the Court or under the direction: 'You and each do solemnly swear that in the case of the State of Texas against the defendant you will a true

verdict render according to the law and the evidence, so help you God.'"

**5.** V.T.C.A., Penal Code, § 12.31(b).

**6.** Article 35.16, V.A.C.C.P.

questioning had gone "far enough about this oath," asked Scott additional questions. Appellant's objection was overruled, appellant restated his "12.31(b)" objection, and the court excused prospective juror Scott, thus sustaining the challenge for cause.

The mere fact that the last few questions concerned § 12.31(b) of the Penal Code does not mean that this was the sole basis for sustaining the State's challenge for cause. Certainly the court did not so state. The challenge for cause was three pronged. The court's action would be justified if only one of the prongs urged was legally proper. *Adams*, in effect, held that a prospective juror could not be disqualified under § 12.31(b) without meeting the criteria of *Witherspoon*, as it was then understood and interpreted. But *Adams* also said:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes prospective jurors who jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *" 448 U.S. at p. 46, 100 S.Ct. at 2527.

"We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." 448 U.S. at p. 50, 100 S.Ct. at 2529.

Even if it can be argued that Scott should not have been excluded solely on the basis of his not being able to take the § 12.31(b) oath, that does not translate into the fact, under this record, that he was excluded in violation of *Witherspoon* as now interpreted by the United States Supreme Court.

The majority says:

"Scott may well have been precisely the type of prospective juror *Witherspoon* would shield from being excluded

for cause: One who represents that extensive segment of the community that objects to the death penalty, and yet one who would follow the law and the evidence to arrive at his verdict.

\*      \*      \*      \*      \*      \*

"The death penalty may not be imposed where even one venireman has been excluded from the jury in violation of *Witherspoon*. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

"Although *Witherspoon* error requires only setting aside the death sentence as a matter of federal constitutional law, this court has held that such error requires reversal and remand for new trial. *Evans v. State*, 614 S.W.2d 414 (Tex.Cr. App.1981). The cause is reversed and remanded."

*Witt* did more than "simplify" *Witherspoon*. The Supreme Court revisited *Witherspoon*, noted the Illinois statutes involved and concluded *Witherspoon* was a "limited holding." It determined that the standard for judging the proper exclusion of a juror opposed to capital punishment set forth in footnotes 9 and 21 of *Witherspoon* which had been followed by it and lower courts had been eroded in *Adams* and was not to be the proper standard to be followed. The *Adams* standard was adopted and the former *Witherspoon* standard was jettisoned.

The State takes the position that Scott was disqualified even under the abandoned *Witherspoon* standard, but if not, certainly under the *Adams-Witt* standard.

Further, Article 35.16(b), V.A.C.C.P., provides:

"(b) a challenge for cause may be made by the State for any of the following reasons:

"(1) * * *

"(2) * * *

"(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment."

This was also one of the bases upon which the State challenged Scott for cause. When objecting to the challenge for cause, appellant objected that Scott was not disqualified under § 12.31(b) and under *Witherspoon,* but he did not object as to excusing Scott on the basis of "35.16." See and cf. *White v. State,* 629 S.W.2d 701, cert. den. 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *Ex parte Chambers,* 612 S.W.2d 572 (Tex.Cr.App.1981). Nothing was presented for review as to the sustaining of the challenge for cause on this basis.

As recognized from *Witherspoon* through *Witt,* the State has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially and who therefore might frustrate administration of a State's death penalty scheme." *Witt,* 105 S.Ct. at 848.

It is well established that in post-conviction habeas corpus proceedings the burden of proof is upon the applicant and includes the burden of proving his factual allegations. See *Ex parte McWilliams,* 634 S.W.2d 815 (Tex.Cr.App.1982), cert.den. 459 U.S. 1036; *Ex parte Salinas,* 660 S.W.2d 97 (Tex.Cr.App.1983); *Ex parte Alexander,* 598 S.W.2d 308 (Tex.Cr.App.1980); *Ex parte Sanders,* 588 S.W.2d 383 (Tex.Cr. App.1979).

In light of the record before us, applicant is not entitled to the relief he seeks. The relief prayed for is denied.

CLINTON, Judge, dissenting.

The question whether venireman Scott was excludable for cause was a close one. The trial court answered the question by applying an unconstitutional standard. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), had not yet been delivered at the time this voir dire was conducted. Without that guidance, the trial court herein was clearly of the opinion that a prospective juror could be excluded for cause if he could not swear that the mandatory penalties of life or death would not "affect" his deliberations.

V.T.C.A. Penal Code, § 12.31(b). The trial court applied that incorrect standard. I dissent to the majority's approval of this error.

Prospective juror Scott was firmly opposed to the death penalty. That does not mean, however, that he was automatically disqualified from serving on a jury in a capital case. No matter how often he was asked whether he would "vote for" or "vote against" the death penalty, the fact remains that as a juror in a capital murder prosecution he would be called upon to do neither. *Granviel v. State,* 723 S.W.2d 141 (Tex.Cr.App.1986) (dissenting opinion). He would first vote on whether applicant was guilty or innocent and then, assuming a verdict of guilt, he would vote on his answers to the Article 37.071 special issues. The question to be determined on voir dire was whether Scott could cast those votes based on the evidence at trial and the trial court's instructions on the law. Scott initially stated that he did not "believe" he could, knowing a death penalty might be assessed as a result. Upon further questioning, however, he stated that he would "have to follow the Court's instructions," that he could decide on applicant's guilt or innocence, and that his answers on the punishment issues would depend on the evidence. He also gave the following answers—surprising after his assertions that he did not consider death a proper punishment—when asked if he could ever consider such a penalty:

Q: All right. Then does that change anything you have said earlier, that you could under certain circumstances consider the death penalty; is that right?

A: I could in—like with a child or something like that.

Q: All right.

A: And *murders,* well, that's—that's possible.

Q: In other words, by saying that you could under certain circumstances consider it, then that means that you would not automatically vote against the death pen-

alty in every conceivable case; isn't that right?

A: I might not, and I may again I might. *It depends on the evidence.* I'm very much against it, but—who knows?" [1]

It was at this point that the State reurged its challenge for cause and the trial court took a hand in the questioning, concentrating on whether Scott could take the oath mandated by § 12.31(b) of the Penal Code:

"Court: You must take an oath, Mr. Scott, that the mandatory penalty of life or death will not affect your deliberation on any issue of fact in the case. Now, can you take that oath?

Witness: The life or death penalty will not affect it?

Court: That the mandatory penalty of life or death will not affect your deliberation on any issue of fact.

Witness: Well, I'd say it would affect it.

Court: It would affect it.

Witness: It would affect it if that—

Court: Are you saying, then, that you cannot take that oath?

Witness: I don't think, no."

The trial court then discharged Scott over applicant's objection.

Both the State and defense glancingly addressed *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in which the Supreme Court invalidated a death sentence given by a jury from which all veniremen who expressed generalized objections to the death penalty had been excluded. The Court concluded that when the State "swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncom-

monly willing to condemn a man to die." 88 S.Ct. at 1776.

In *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court restated the holding of *Witherspoon* and applied it to the Texas capital murder procedure. Specifically it addressed the trial court's exclusion of prospective jurors who could not swear that the mandatory penalties of life imprisonment or death would not *affect* their deliberations concerning issues of fact. V.T.C.A. Penal Code, § 12.31(b). The Court reversed the death sentence in *Adams,* holding that § 12.31(b) may not be used to exclude prospective jurors on any basis broader than that set out in *Witherspoon.* A venireman who testifies merely that his deliberations will be "affected" by the mandatory penalties in a capital murder case may only mean that he will take his duties as a juror more seriously, not that he will neglect them. 100 S.Ct. at 2528. He may not be excused for that reason. Even a juror who harbors moral or philosophical objections to the death penalty may be able to weight the evidence presented at trial and truthfully answer the special issues in the affirmative.

"Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt."

100 S.Ct. at 2529.

The trial court in the instant case was without benefit of the *Adams* opinion because it was not delivered until some two months after the conclusion of applicant's trial.

**1.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indi-

cated.

The Supreme Court's latest return to *Witherspoon* is in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *Witt* "simplifies" the *Witherspoon* limitation on exclusion of veniremen, 105 S.Ct. at 851, and reaffirms the following standard from *Adams*:

" ... a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

105 S.Ct. at 850, 852.

The opinion in *Witt* also holds that in a federal habeas corpus action under 28 U.S.C. § 2254 deference must be paid to the findings of the trial court, and that where a record does not show otherwise it is presumed that the trial court applied the proper standard in its exclusion of prospective jurors. *Id.*, at 853, 856.

Here, however, the trial court clearly did *not* apply the proper standard.

At the time he was excused it was not yet clear whether Scott could put aside his personal feelings and honestly answer the Article 37.071(b) special issues in the punishment phase of a capital murder trial. The confusion was compounded because even after the State briefly explained that the jury would be required to answer two questions at punishment, both sides continued to ask the venireman whether he would "vote for" or "vote against" capital punishment. Although Scott stated initially that he would automatically "vote against" imposition of the death penalty, upon further questioning he maintained that he would follow the trial court's instructions as to the law, that he could consider the death penalty in cases of murder, and at least three times that his decision on the proper verdict would depend on the evidence.

It was at this point that the trial court took charge of the questioning and asked simply if Scott's deliberation would be "affected" by the mandatory penalties in a capital case. Scott answered affirmatively. The trial court then interrupted the venireman's attempted qualification of this answer to ask if Scott could take an oath that he would not be so affected. Receiving a negative reply, the trial court immediately dismissed the prospective juror.[2] Thus, rather than inquire to what extent Scott's attitude toward the death penalty would "affect" his ability to render a true verdict in accordance with his oath as to special issues under Art. 37.071, the court cut off his answer and excused him when he stated he could be affected at all. In doing so the trial court clearly misapplied § 12.31(b):

" ... the application of Sec. 12.31(b) that is required by *Adams* and *Witherspoon* calls for a determination of not merely whether the mandatory penalty would 'affect' his deliberations, but rather the *extent* to which the juror would be affected." [Emphasis in original]

*Graham v. State*, 643 S.W.2d 920, 923–24 (Tex.Cr.App.1983). Exclusion of prospective jurors based on this overbroad definition of "affect" was exactly the procedure condemned in *Adams*. Scott may well have been precisely the type of prospective

---

**2.** The conclusion that the court based its decision on the venireman's admission that he would be "affected" by the mandatory penalties is supported by the court's questioning of prospective juror Ida Mary Seymore, which concluded as follows:

"THE COURT: All right. Then let me ask you another question. Even though you believe that the death penalty should not be given, could you nevertheless take the oath which says that the mandatory penalty of life or death will not affect your deliberation on any issue of fact?

THE WITNESS: No.

THE COURT: All right. All right. I will excuse you, then."

Earlier answers of Seymore's demonstrated that she could properly be excluded for cause under the standard adopted in *Wainwright v. Witt*, supra. Even so, the conclusive factor for the trial court seemed to be that she could not swear that her deliberations would be unaffected by the mandatory penalties of life or death. That was the last question asked by the trial court before excusing her, just as in Scott's case.

juror *Witherspoon* would shield from being excluded for cause: one who represents that extensive segment of the community that objects to the death penalty, and yet one who would follow the law and the evidence to arrive at his verdict. If so, his exclusion was in violation of the Sixth and Fourteenth Amendments to the United States Constitution. *Adams*, supra; *Hartfield v. State*, 645 S.W.2d 436, 441 (Tex.Cr. App.1983). At the very least his dismissal was premature. *Lackey v. State*, 638 S.W.2d 439, 476 (Tex.Cr.App.1982) (Opinion on Appellant's Motion for Rehearing); *Rougeau v. State*, 651 S.W.2d 739, 743 (Tex.Cr.App.1982). The party seeking to exclude a prospective juror has the burden of proving the exclusion is proper. The State had not satisfied that burden before Scott was excluded. *Ex parte Bravo*, 702 S.W.2d 189, 192 (Tex.Cr.App.1985) (Opinion on State's Motion for Rehearing). It was in that sense that Scott's dismissal was premature. No one contends that applicant was denied his right of examining the prospective juror. It was the State that had not gone far enough to sustain its burden of showing Scott was properly excludable for cause. His answers to the crucial questions of whether he would follow the law and the evidence in arriving at his verdicts were ambiguous. Indeed, his clearest statements that it was "possible" for him to consider the death penalty for "murders" and that his decision would depend on the evidence came just before the trial court intervened in the voir dire. The trial court then abruptly resolved the ambiguity by applying the standard later condemned in *Adams*.

The death penalty may not be imposed where even one venireman has been excluded from the jury in violation of the rule of *Witherspoon*. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). Because I believe one venireman was so excluded in this case, I respectfully dissent.

TEAGUE, J., joins this opinion.