Walter Key **WILLIAMS, Appellant,**

v.

The **STATE of Texas, Appellee.**

No. 68971.

Court of Criminal Appeals of Texas, En Banc.

June 22, 1983.

Rehearing Denied Sept. 14, 1983.

694

Allan R. Manka, San Antonio, for appellant.

Bill M. White, Dist. Atty. and Sam L. Ponder, Joseph W. Galenski & Alan E. Battaglia, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant's conviction and sentence of death for capital murder are here subjected to automatic review. Article 37.071(f), V.A.C.C.P. The murder was committed in the course of robbery or attempted robbery. V.A.T.S. Penal Code, § 19.03(a)(2).

In the first ground of error appellant contends that the State failed to adduce sufficient evidence to warrant the jury's affirmative answer to the second punishment issue, posed by Article 37.-071(b)(2), supra:

> "... whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; ...."

Under Article 37.071(c), supra, before sentence of death may be imposed the State must prove beyond a reasonable doubt each punishment question submitted, including "future dangerousness," as the second special issue often is called. Evidence adduced at the guilt stage, including unadjudicated prior criminal conduct of the accused, may be considered by the jury at the punishment stage, and the circumstances of the offense itself, if severe enough, can sustain a "yes" answer. *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982); *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979).

Appellant's two written statements to police, admitted into evidence, detail his participation in two robbery-murders within a few hours of each other on the night of February 9, 1981 in San Antonio. Driving his father's automobile, the nineteen year old appellant stopped at a local high school and picked up an acquaintance named Ted, whom he had known for two or three weeks. They went drinking beer and visiting friends. Ted and appellant both complained of being "broke," and Ted suggested they go to a convenience store. Appellant agreed. According to appellant, "Ted asked who was going to do it," and appellant gave Ted his parents' pistol and told him, "I wasn't going to kill nobody." While appellant acted as lookout, Ted shot the store attendant twice, reached through the window, and grabbed the money.

Ted and appellant split the proceeds, and appellant drove the getaway car, stopping at a dumpster so that Ted could dispose of checks and gasoline receipts from the store. They went to the home of one named Rick and tried unsuccessfully to wake him up. Appellant removed two shells (apparently the spent casings) from the pistol, threw one of them under Rick's bed, and placed the other on the window ledge behind the curtain. They left Rick's, bought some beer, visited a female friend, and went to appellant's house, where he lived with his parents. Appellant asked if he had received any telephone calls, paused to hide his share of the loot in his bedroom, and drove away with Ted.

The details of the second robbery-murder, for which the conviction and sentence in this case were obtained, are best told in appellant's own words:

> "I told Ted that I used to work at a Circle K [convenience store] and then we

drove to the Circle K where I used to work at....

We had my mother's gun with us which I had gotten earlier from the house and we had on top of the front seat between the two of us.[1] When we got to the Circle K, we drove by and then we parked the car around the corner and then we walked to the Circle K.

I got my mother's gun, which is a .38 caliber or a .32 caliber pistol and I put it in my waistband of my trousers. After we got to the store, we went inside together and I went to the back of the store where the coolers are and I got a sandwich, soda water and then I went to where the chips are and got some potato chips.

I then went to the cashier's counter and put everything on top of the counter. Ted was standing on the other side of the counter opposite from where I was.

*... I knew the guy that was working there because I met him when I had been working there and his first name was Danny.*[2] Ted had gotten some stuff also so when Danny turned to take care of Ted first, I pulled out my mother's gun and shot Danny one time. I hit him and he fell down.

Ted and I then walked behind the counter. I tried to open one of the cash registers and Ted was trying to get the other register open. I couldn't get the register open, so then I just ran outside and to the car.

Ted stayed inside the store after I left and I did not see what he did or get after I left. I got to the car, got inside and then I drove up to the store and yelled at Ted for us to go.

*Ted wouldn't get out of the store, so I left him there. I then drove home and went to bed.*

The reason I left Ted at the store because when I was yelling at him, a car drove by and I got scared, so I left. I did not get anything from the Circle K because I was scared after I shot Danny.

*I had been asleep for about 30 to 40 minutes when the police came to my house....*"[3]

According to medical testimony, Danny, the victim in the second robbery-murder, died of a single gunshot wound to the back. The body also had abrasions about the face.

■ Appellant relies on similarities between this case and *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982) in which the defendant had committed another robbery minutes before the primary robbery-murder, but had no prior convictions involving moral turpitude. This Court noted that the two offenses

"were essentially parts of a one-night crime spree. It does not show a repetition of criminal conduct so much as a single criminal purpose with successive targets." *Id.*, at 603.

No record of prior convictions was introduced in the present case, and, as in *Roney*, neither was psychiatric or character evidence offered by the State or the accused.[4] Of course, psychiatric testimony is not essential to support an affirmative answer to the question of future dangerousness. *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983).

In *Roney* no one was shot in the first robbery. However, in the present case appellant's statements show that he and Ted planned the death of both store attendants

---

1. Pretrial testimony showed that the pistol was his father's and had been lent to appellant by his mother. (More on the gun anon.)

2. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

3. Pretrial testimony revealed that on a table next to appellant's bed lay the murder weapon

and a birthday card to him, signed by the young man he had just murdered. The jury did not learn of the card.

4. Appellant's two trial counsel (one of whom also submitted the appellate brief but made no oral argument before this Court) presented no case at the guilt stage or at the punishment stage.

several hours, not minutes, apart. Although appellant declined to kill the first man himself, he gave the pistol to Ted for that purpose. After participating in that capital murder, appellant selected the second victim, a former coworker, *a man he knew would recognize him.* The jury was entitled to infer that when appellant drove to the second store he had every intention of killing the attendant in a "calculated and cold-blooded" manner, in order to make sure there were no witnesses. *O'Bryan v. State,* 591 S.W.2d 464, 480 (Tex.Cr.App. 1979). In this case there was no "conflicting evidence about the shooting," such as the struggle for the weapon in *Garcia v. State,* 626 S.W.2d 46, 51 (Tex.Cr.App.1982), and no assertion by the accused that "I had to kill that son of a gun, 'cause he was going to kill me," as in *Roney,* supra, at 602.

Furthermore, the evidence permitted the inference that by leaving shells in Rick's room appellant planned to implicate him in the first robbery-murder. Appellant also showed lack of concern for others by using his parents' pistol and automobile in the commission of the offenses, and, at the first hint of trouble, by driving off and abandoning his cohort at the scene of the second murder.

Appellant did not act like the "agitated and somewhat distressed individual" in *Roney,* who at one point laughed about the offense but at other times "repeatedly claimed he 'had to' kill to defend himself and muttered to himself about the offense." Supra at 603. Appellant drove home and went to bed. Police found him asleep a short time later.

■ The jury was presented no evidence that appellant was under the influence or domination of any other person, or that he was under mental or emotional pressure which might be regarded as mitigating. The absence of such circumstances is probative evidence of future dangerousness. *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.

App.1980). Contrary to assertions in appellant's brief, he did not surrender himself to police, as did Roney.

As proof of appellant's "remorse" over the death of the man he shot, he points to his second written statement, in which he said, "I pulled out my mother's gun and shot Danny one time, why I do not know.... I then thought about it for awhile and I decided to tell the complete truth.... The reason for this is because I have never killed anybody and *it bothered me.*" The jury was entitled to discount such selfserving remarks, made at a time when appellant no doubt knew the police already had obtained overwhelming evidence of his guilt.[5] The jury rightfully could conclude appellant was so "bothered" by the murder that after committing it he went directly to sleep.

■ Appellant's own accounts of his involvement in two capital murders and the surrounding circumstances provided sufficient evidence to support the jury's finding of his future dangerousness. Appellant's first ground of error is overruled.

■ In ground of error number five appellant contends the trial court committed reversible error in admitting evidence obtained in violation of his Fourth Amendment rights against unreasonable search and seizure. However, appellant omits any reference to the evidence of which he complains, and thereby fails to comply with Article 40.09(9), V.A.C.C.P., which reads in pertinent part as follows:

"... *Each ground of error shall briefly refer to* that part of the ruling of the trial court, charge given to the jury, or charge refused, *admission or rejection of evidence,* or other proceedings which are designated to be complained of *in such way so that the point of objection can be clearly identified and understood by the court.* If the appellant includes in his brief arguments supporting a particular ground of error, they

5. They had the murder weapon and the cooperation of an eyewitness and Ted, appellant's irate abandoned partner.

shall be construed with it in determining what point of objection is sought to be presented by such ground of error; and *if the court, upon consideration of such ground of error in the light of arguments made in support thereof in the brief, can identify and understand such point of objection, the same shall be reviewed notwithstanding any generality, vagueness, or any other technical defect* that may exist in the language employed to set forth such ground of error."

The fault we decry here is worse than "generality, vagueness, or any other technical defect," which the Court often can overcome by closely considering the ground of error and accompanying argument. *Nowhere* in the ground of error or argument does appellant identify the evidence he alleges was improperly admitted. The closest he comes to doing so is in his reference to the objection made and overruled at trial (which we have located despite the inaccurate citation to the nineteen volume record):

"Judge, at this time we would renew our earlier objections which were made in the form of motions on which we had hearings, of *anything that occurred after the officers entered the house* on the basis that it was an *illegal entry, made without warrant,* and we would *object to any testimony, any evidence obtained as a result of that entry.*"

Appellant's motion to suppress evidence does not appear in the record, but from our reading of the transcription of the hearing held on that motion we conclude that the evidence principally objected to there and here is the murder weapon discovered by police in appellant's bedroom. In the interest of justice we will address the question of the admissibility of the pistol.

While appellant and his partner, Ted, were still inside the Circle K, an employee from another Circle K store, Roberto Gutierrez, drove by and noticed that his friend, Danny, the attendant he knew was on duty, was nowhere visible. Instead, two black males were at the cash registers, and one of them looked familiar. Gutierrez wheeled around and drove back. When appellant abandoned Ted and fled, Gutierrez pursued appellant and obtained the vehicle's description and license number. Gutierrez returned to the store to find that police had discovered the killing independently, had apprehended Ted nearby, and had returned him to the scene.

Gutierrez gave police the vehicle information and told them about the driver: "He looks like this guy named Walter who works there on the weekends, you know, who has replaced me on the weekends." Ted told police that a person he knew only as "Walter" had shot the deceased with a long-barreled revolver, and that he would show them where Walter lived. At his direction Ted and police drove to a house and found a vehicle in the driveway. The description and license number matched the information given police by Gutierrez.

While Ted was removed to the police station, three officers approached the front door of the house. Officers testified that they did not approach the house with the intention of arresting anyone. They wished to ascertain whether their information about Walter was correct. Six officers covered the other exits because, as one testified, "It is kind of embarrassing if you have a possible suspect and you are at the front door and he goes out the back door."

The officers testified that they did not seek a search or arrest warrant because they were not sure their information about Walter was reliable. The computer was "down," so they could not check the vehicle registration. In the words of Detective Roy Thomas on crossexamination,

"A: When I went to the location I was trying to verify the information that I had received from Mr. [Ted] Edwards, if a Walter lived there, and if so, if he would talk to me as to what he said happened, if he had loaned his vehicle to somebody, or, you know, what had transpired, how his vehicle—if that was his vehicle that had been involved and what had taken place."

Thomas testified that he did not believe he had probable cause to make an arrest or search until he could confirm the information he had received about Walter. For that reason, and because no magistrate was available at 4:30 a.m., he did not seek a warrant.

When Thomas knocked on the front door, according to his uncontroverted testimony, the following occurred:

"An older gentleman came to the door and I asked him if Walter was there, if Walter lived there, and he said yes, that it was his son. And I identified myself as a police officer. I had my police badge and I showed him my badge and he said 'What is the problem?' He wanted to know what was wrong. I told him that we had information that Walter had been involved in the killing of a man. He acted surprised, you know, shocked and I asked him again if Walter was there and if we could talk to him and he said, 'Yes, come on in,' and so we went into the house."

*Appellant's father testified that he consented to the entry by police.*

Appellant's father led the officers to a bedroom. The door was open; the room was dark.[6] Someone turned on the light; no one remembered who. Appellant, apparently asleep, lay face down on the bed. On the nightstand beside him was a long-barreled revolver. *Appellant's father testified that as he stood in the hallway he could plainly see the pistol.*

Thomas moved between appellant and the pistol, awakened him, and, concluding that he then had probable cause, placed appellant under arrest. According to Thomas's testimony, *the pistol looked like the one described by Ted:*

"When we got back to the bedroom and the gun was laying there, at that time the fact that Walter was there, the vehicle was there, the weapon was there that matched the description, I felt like there was probable cause to arrest Walter and read his rights to him and everything at that time." [7]

Appellant's father then signed a form, which he read into the pretrial record as follows: [8]

"Q [Prosecutor]: Yes, sir, go ahead.
A [Appellant's father]: 'Consent to search, State of Texas, County of Bexar, I, Lucian Williams, having been informed by the hereafter named Texas peace officer that I have a constitutional right to be free from having him or other officers make a warrantless search of the hereafter mentioned *premises under my control* and also a constitutional right to refuse to give him or any other officer consent to make such a search and that such rights are guaranteed to me both by the Texas and Federal Constitutions, do hereby voluntarily waive those rights and authorize the following named officer, to-wit, Detective B. Hook and Detective L. Dehaven and any other officers working with him to conduct a *complete search of the following premises*, building and vehicles located in 1302 Wyoming, Texas, at and namely, single story white fram [sic] home known as 1302 Wyoming and a Ford, dark green over light green, license number LNZ 265, and *to seize and take therefrom any item of personal property they may believe*

---

**6.** At some points in his testimony, appellant's father seemed to recall that the light was on, that the door was closed, and that he did not go to the bedroom until later. At other points he remembered going to the bedroom initially with the officers, and seemed to drop his contention that the door was closed.

**7.** In this appeal appellant does not challenge, and we do not address, either the legality of the arrest or the admissibility of the statements he made while in custody. We consider here only the actions of police in entering the premises and taking possession of the pistol.

**8.** Police testified that appellant also signed such a form. But appellant disputed the signature, and the form does not appear in the record. Later that morning appellant and his father jointly signed another consent form, and at the direction of both men police found in the house the money taken in the first robbery.

*to constitute evidence in a criminal proceeding.*

I have given this consent of my own free will and accord and without being subject to any threats, promises, com- pulsion, or persuasion of any kind. *I know that any item of personal prop- erty seized by the above named officer or other officers with him and taken by them from such premises can and will be used in a criminal proceed- ing,* signed Lucian Williams,' witness- es, Roy W. Thomas and—I imagine it is A.M. Zalesly.

Q: Anyway, you had an opportunity to read that and as far as you know, you did read that as that—

A: *I didn't read it thoroughly, but I read it.*

Q: It states you had all of these rights and you didn't have to consent to any search at that time, is that right?

A: Do what?

Q: *It said you didn't have to consent to any search, is that right?*

A: *Yes.*

Q: *But you consented to search, sign- ing that and letting them search your house?*

A: *Yes."*

No one touched the pistol until sometime later, when an investigator arrived.

At the hearing on the motion to sup- press, appellant testified that no one was allowed in his bedroom without his permis- sion and that he was in the habit of closing and locking the door. He did not remem- ber whether he had closed the door that night. He testified that there was no key to the lock, which could only be operated from inside, and that his door was not broken down by police.

9. Regarding the *Coolidge* plurality opinion, the *Brown* plurality stated, "While not a binding precedent, as the considered opinion of four members of this Court it should obviously be the point of reference for further discussion of the issue." 103 S.Ct. at 1540. That applies as well to *Brown.*

10. The unresolved question of who turned on the light in the bedroom is irrelevant, because,

■ Appellant's father testified that the pistol was his, and the consent form he signed stated that the house was under his control. The police never displayed any weapons, threatened any force, or asserted any authority to enter without consent. Viewing the totality of the circumstances, we conclude that appellant's father, with full authority to do so, freely and voluntari- ly gave informed consent to the police en- try of the house and the bedroom, and to their taking possession of the pistol. See *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneck- loth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Annot., 4 A.L.R. 4th 196, 1050 (1981). The circum- stances here were not unlike those in *Cool- idge v. New Hampshire,* 403 U.S. 443, 489– 490, 91 S.Ct. 2022, 2049–2050, 29 L.Ed.2d 564 (1971), in which the plurality decided that the actions of police in taking posses- sion of Coolidge's guns with his wife's con- sent *did not constitute a search and sei- zure at all.*

■ Even if the actions of police amounted to a *seizure,* they were justified under the "plain view" doctrine, as enunci- ated in *Coolidge* and recently clarified in *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983):[9] (1) the offi- cers were lawfully on the premises with the consent of appellant's father;[10] (2) the discovery of the pistol was "inadvertent," i.e., the police did not "know in advance the location of the evidence and intend to seize it," *Coolidge,* supra, 403 U.S. at 470, 91 S.Ct. at 2040, "relying on the plain view doctrine only as a pretense," *Brown,* 103 S.Ct. at 1540;[11] and (3) when the officers saw the pistol lying beside appellant and fitting the description given by Ted, they

as we are told in *Brown,* 103 S.Ct. at 1541, "the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." (Footnote with citations omitted.)

11. The plurality intimated in *Brown* that, in the final analysis, "inadvertence" might not be a requirement of the doctrine.

had probable cause to believe it was seizable as evidence of a crime.[12] See *Sutton v. State,* 519 S.W.2d 422 (Tex.Cr.App.1975) (police, invited by appellant into his home, saw on bedside table in adjoining room a pistol matching the description of one on list of stolen items).

When appellant's father led the officers to the bedroom to talk with his son, "it was not incumbent on the police to stop [him] or avert their eyes." *Coolidge,* supra, 403 U.S. at 489, 91 S.Ct. at 2049. When officers are lawfully on the premises and "inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it." *Id.,* at 467–468, 91 S.Ct. at 2038–2039. The trial court properly overruled appellant's motion to suppress the pistol.

■ Appellant contends in his second and sixth grounds of error that the action of the trial court in admitting at the punishment stage evidence of the earlier unadjudicated robbery-murder was error. These grounds are without merit and are overruled. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr. App.1982); *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979).

■ Appellant's third ground of error, in which he complains that Article 37.-071, V.A.C.C.P. is unconstitutional because its vagueness allows juries to act arbitrarily, is without merit. *Jurek,* supra. The same is true of his fourth ground of error, in which he contends that the death penalty is per se unconstitutional. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Both grounds are overruled.

■ In ground of error number seven appellant complains that "section eight of the charge of the court at the guilt phase

of the trial limited the jury's consideration to robbery and attempted robbery. It did not give the jury the opportunity to consider the State's failure to prove other elements of the offense of simple murder." Section eight of the charge reads as follows:

"If you find beyond a reasonable doubt that on the occasion in question the defendant, Walter Key Williams, did intentionally or knowingly cause the death of Daniel A. Liepold by unlawfully shooting him with a gun, *but you have a reasonable doubt as to whether the defendant was then and there engaged in the commission of robbery or attempted robbery* of Daniel A. Liepold at the time of the said shooting, if any, then you will find the defendant guilty of murder, but not capital murder."

Under section seven of the charge as shown below, the jury found appellant guilty of capital murder:

"Now if you find from the evidence beyond a reasonable doubt that on or about the 10th day of February, A.D., 1981 in Bexar County, Texas, the defendant, Walter Key Williams, did *intentionally or knowingly cause the death of an individual,* namely: Daniel A. Liepold, by shooting the said Daniel A. Liepold with a gun, and the said defendant did then and there intentionally cause the death of the said Daniel A. Liepold while in the course of committing or attempting to commit the offense or [sic] robbery upon Daniel A. Liepold, you will find the defendant guilty of capital murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder."

The jury necessarily considered and found the evidence sufficient to prove the "other elements of the offense of simple murder," which are included as elements of capital

---

**12.** The *Brown* plurality found that the *Coolidge* plurality's "use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an

unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." 103 S.Ct. at 1542.

murder. The only difference between the two offenses, under the facts of this case, is the additional robbery or attempted robbery element of the latter.[13]

The portion of the charge complained of properly applied the law to the facts of this case. At any rate, when we consider the complaint in light of the charge as a whole and the jury's verdict finding appellant guilty of the greater offense, we conclude that the alleged error in the paragraph on the lesser included offense, if error, is not reversible. See *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr.App.1982) (Opinion on Rehearing).

 In ground of error number eight appellant contends that the trial court committed reversible error by charging the jury at the punishment stage "not to consider or discuss any possible action of the Board of Pardons and Paroles or of the Governor or how long this defendant would be required to serve to satisfy a sentence of life imprisonment." The giving of an almost identical instruction was approved in *Freeman v. State*, 556 S.W.2d 287 (Tex. Cr.App.1977) as within the judge's discretion. This ground is without merit.

In ground of error number nine appellant contends that the trial court committed reversible error "by going beyond the provisions of Article 35.17 [(2), V.A.C. C.P.] and discussing the range of potential punishments with prospective jurors." In capital cases the statute mandates that the trial court "propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion." The statute does not mention range of punishment

and does not in any way purport to restrict the discretion of the trial judge in conducting voir dire. Appellant cites no authority for his contention, no incorrect statement by the trial court about possible punishment, and no harm done to his rights.[14] His own counsel later informed prospective jurors about ranges of punishments for a variety of offenses. No reversible error is shown.

The judgment of conviction is affirmed.

TEAGUE, J., dissents.

---

**13.** V.A.T.S. Penal Code, § 19.02(a)(1), the "simple murder" statute, as appellant would call it, reads as follows:

"... intentionally or knowingly causes the death of an individual; ..."

The capital murder statute, V.A.T.S. Penal Code, § 19.03, reads in pertinent part as follows:

"(a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and:

(2) The person intentionally commits the murder in the course of committing or attempting to commit ... robbery, ...."

**14.** Appellant does not contend that any juror was improperly seated or excused.