James Roy KNOX, Appellant,

v.

The STATE of Texas, Appellee.

No. 69608.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 30, 1987.

Allen C. Isbell, on appeal only, Houston, for appellant.

Michael J. Guarino, Dist. Atty. and Susan W. Burris, Asst. Dist. Atty., Galveston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

This automatic appeal is taken from a conviction of capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The jury returned affirmative answers to all three special issues submitted under Article 37.071(b), V.A.C.C.P., and the trial court assessed the mandatory death penalty.

Appellant raises five points of error on appeal. Two points allege reversible error was committed during voir dire, while the remaining points of error address the court's refusal to grant appellant's requested charge on parole eligibility at the punishment phase of trial. Appellant does not challenge the sufficiency of the evidence to sustain the conviction, however, a brief presentation of the facts will help place appellant's points of error into proper perspective.

The evidence presented at trial shows that appellant entered "Joe's Pharmacy Center" in Galveston on November 10, 1982. The pharmacy was owned by the deceased, Joseph Sanchez. According to Ronald Dyda, who worked for the deceased, the appellant approached the counter with a pistol in his hand. Dyda described the scene:

"Q. Just tell us what you remember?

"A. Okay. I remember he pointed the gun, and asked for the money. That he asked us to lie down. Joe didn't lie down, so he asked me to tape him up, tie his hands behind his back. And after that, I had a little trouble getting him tied up, so the guy asked us to lie on the floor again.

"Okay. Sometime during that the phone rang, and I don't know if it was then or a little later on. But—okay. I heard a shot. I saw the curtain, or saw the curtain fall, and Joe was laying there, and [the] guy pointed the gun at me, and asked for the money and drugs.

"Q. Did you give him some of the pills?

"A. I gave him some Demerol. I don't remember how many. I just grabbed off the shelf.

"Q. Okay. Did he then leave?

"A. Yes, sir."

During the course of the robbery the deceased received a phone call from Joanne Swindell, "about 5:25 or 5:30" on November 10, 1982. Swindell phoned to have a prescription filled, but when the deceased answered, Swindell overheard the following:

"A. * * * I then heard Joe's voice say, 'He don't know where the dope's at. He don't know where the dope's at.' As if he were pleading with someone. He said that about three times.

"I then heard Joe say, 'Here's the money. Take it all.'

"Q. When you say Joe, you are talking about Joe Sanchez?

"A. Right. At that time I heard another male voice say, 'I want the God damned dope.'

"And then Joe replied again, about three times, 'He don't know where the dope's at.' Like he was pleading, is the way I took it.

"And then the same male voice again said, 'You son of a bitch, I am going to kill you.' Then I heard a shot.

"Seemed like four or five seconds passed, and then I heard that same voice again say, 'Now you will give me the dope, you son of a bitch.'

"Q. Did that sound like he was talking to the other person in the room?

"A. Like—Right. There was another person in the room."

Both Coleen Austin and Robert Cleric testified they were sitting in "Kathy's Katerers" next door to "Joe's Pharmacy Center" around 5:30 p.m. on November 10, 1982, when they heard a loud "bang," a "pow." After checking the rear portion of the store, the two walked out the front door, "when this man came around the corner at a slight run." Both testified that the man held some brown medicine bottles in his right hand, and that his left hand was tucked under his shirt or jacket. Gene Austin, Coleen's husband, also saw the man trotting towards the corner of the street, and noticed: "In his right hand he

was carrying, looked like pharmacy type bottles, might contain pills or prescriptions."

All three witnesses described the man as being extremely thin. Although Coleen Austin could not positively identify appellant as the same man she saw over three years before, she did testify that "he [appellant] is as thin as the gentleman I saw, who was extremely thin that day." Gene Austin also stated the man was "extremely thin," and that he had "shorter length, stringy type hair, rather haggardly." According to Cleric, the man "was about six foot tall, real slim, kind of dirty looking face, needed a shave and few things." Cleric could only testify that appellant closely resembled the man he saw on November 10, 1982.

Gene Austin testified that after rounding the corner the man walked across the back parking lot of his store and to the alleyway, where he got into a waiting car "and drove down the alley toward 46th Street."

George Holland, the driver of the getaway car, testified that he parked behind the pharmacy and waited while appellant got out and walked around the building. Holland stated that when the appellant returned to the car a few minutes later "he said, 'Let's get the Hell out of here. He got ignorant on me,' or something like that; he said he had to shoot him." Holland noticed that appellant carried "two or three brown pill bottles." Appellant next gave Holland directions to get out of Galveston, but when Holland learned that appellant had shot someone, he ordered appellant out of the car on the mainland side of the causeway bridge.

Appellant was later picked up by a friend, Gary Morgan, who drove appellant to the bus station in Houston. Morgan stated that appellant related the events leading up to the shooting:

"He [appellant] said that he went into the drug store, and there were two men in it; that he taped the bigger man, tapped him up, and he broke the tape. Then he taped him up again, and he broke the tape, and went for his back pocket. And Roy said he shot him in the chest, blew him back through some blue curtains, and the other guy give (sic) him the dope, and he got the money out of the cash register, and he left and got back in the car with George."

Morgan also testified that appellant had four brown bottles in his possession, of which he gave Morgan two for driving him to the bus station.

After returning to his home in Birmingham, Alabama, Morgan again saw appellant and testified about the following:

"Q. Did the Defendant seem very concerned about the death of Joseph Sanchez?

"A. No, sir, didn't seem to really bother him at all.

"Q. Did he say anything about it?

"A. He was leaning back on the couch. And he was high. And he just laughed about it."

This testimony was corroborated by a friend named Robert Clark, who stated that appellant did not seem concerned about the shooting.

Dr. William Korndorffer, Chief Medical Examiner for Galveston County, testified that the deceased died from a gunshot wound that pierced his heart and aorta, causing him to bleed to death.

No evidence was presented as to when or where appellant was actually arrested.

Appellant's first point of error alleges that the trial court erred in excluding prospective juror Evelyn Reeves from the jury panel, contending that she was qualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). His second point of error asserts that the trial court erred in overruling appellant's challenge for cause after juror Arma Weiss was shown to be biased in favor of the Galveston County Police officers with whom she had worked.

This Court has frequently addressed the voir dire issue in death penalty cases in light of *Witherspoon* and *Witt*. As noted in *Ex parte Russell*, 720 S.W.2d 477, 482 (Tex.Cr.App.1986), *Witherspoon*'s footnote

21 appeared to hold that prospective jurors may be excluded for cause if they made it

"unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*. *Witherspoon*, supra, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. (Emphasis in original.)"

In *Witt*, however, the Supreme Court "abandoned both *Witherspoon*'s substantive standard and its stringent burden of proof requirement." *Ex parte Russell*, supra, at 484. As a result, the standard established in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), was reaffirmed, to-wit, whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." The Supreme Court added: "We note that, in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" *Wainwright v. Witt*, supra, 105 S.Ct. at 852. The modification of *Witherspoon* by *Witt* was most recently endorsed by the Supreme Court in *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

The *Adams* standard, as reaffirmed in *Witt*, has also been adopted and applied by this Court.

"The proper standard for excusing a prospective juror on the State's motion for cause is where the record viewed as a whole supports the finding that the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and oath. *Wainwright v. Witt* (citation omitted). In adopting this standard, the Court dispensed with *Witherspoon*'s reference to automatic decision making and the requirement that a juror's bias be proved with unmistakable clarity."

(Footnote omitted) *Montoya v. State*, 744 S.W.2d 15, 19 (Tex.Cr.App.1987); see also *Mann v. State*, 718 S.W.2d 741, 746, n. 3 (Tex.Cr. App.1986); *Clark v. State*, 717 S.W.2d 910, 915 (Tex.Cr.App.1986); *Carter v. State*, 717 S.W.2d 60, 74–75 (Tex.Cr.App. 1986); *Hogue v. State*, 711 S.W.2d 9, 17, n. 3 (Tex.Cr.App.1986); *Sharp v. State*, 707 S.W.2d 611, 620 (Tex. Cr.App.1986); *McKay v. State*, 707 S.W. 2d 23, 30 (Tex. Cr.App.1985).

We have also held that "[a] juror who will ultimately be guided by his or her personal beliefs *rather than the law* is not qualified to sit on a jury in the State of Texas." (Emphasis supplied.) *Landry v. State*, 706 S.W.2d 105, 105 (Tex.Cr.App.1985).

Initially veniremember Evelyn Reeves stated that she had no religious, moral, or conscientious scruples against the death penalty, adding: "I feel like if a person harms someone, or my family, that I love very much, and they killed them, I would feel like they should be punished in the same fashion." However, when asked whether she could "serve as a juror in a capital murder case, without doing violence to your conscience, answer not only guilt/innocence question, but also these two questions, regardless of the consequence of your answer," Reeves equivocated:

"MS. REEVES: The more I think about that, *I don't know what my conscience would do to me to say put this person to death.*

"But, like I say, and of course Mr. Sanchez was not kin to me. But I feel like any person commits death upon another person, I think they should be punished equally, and get the death penalty.

"THE COURT: You think he should get death for ordinary murder, not capital murder?

"MS. REEVES: Reason I think that, I think maybe a few of these people put to death that kill people, maybe there wouldn't be so many of them.

"THE COURT: No question about that.

"MS. REEVES: That's my feeling. *Now, coming to say I want this man to die, maybe my religious feelings might take over there.*

\* \* \* \* \* \*

"MS. REEVES: When I first came up here, I had thought about that. I said, like I told you, I feel like if a person kills someone with a gun, I think they should be punished by being put to death.

*"When it comes down to actually saying I want this man to die because he killed someone, I don't know whether my religious beliefs would let me live with that."* (Emphasis supplied.)

Reeves' reluctance to serve on a capital jury was not based on a personal bias against the death penalty, but rather on religious grounds.

"MS. REEVES: Once again, I feel like if anyone commits a murder, they should be punished in the same fashion.

*"But, once again, coming down to saying yes to commit him to death, I don't know if the Lord would let me do that."* (Emphasis supplied.)

Although Reeves admitted that she could answer both special issues affirmatively, she was not sure whether the ultimate sanction of death would not cause her to change her mind.

"MS. REEVES: And, yet, I feel like if you were to say yes and yes [to the special issues], *I don't know whether the Lord would love me anymore.*

"THE COURT: In other words, it would violate your conscience?

"MS. REEVES: I guess that's what you would say, violate my conscience.

"THE COURT: Would the fact the punishment is life or death, would that effect (sic) your verdict, or finding a verdict of guilty, would it in some way impair your service as a juror, and judgment?

"MS. REEVES: *It would probably impair me,* because I don't know, like I say, I don't think I am the one for the jury.

"THE COURT: Is that because you couldn't conscientiously, religiously, or morally follow this procedure?

"MS. REEVES: Because I am too sensitive." (Emphasis supplied.)

At this point the prosecutor ascertained Reeves' true feelings concerning her participation on a death penalty jury.

"Q. My question to you is this: Just as the Judge said, the fact you have religious feelings, you are obviously a deeply religious person.

"A. I am that.

"Q. I can tell you are, and *your personal belief about the matter is such that it might impair your serving as a juror in this case,* would you agree with that?

"A. *I agree with you there.*

"Q. And, in fact, you—*it would seriously interfere with your ability to answer the questions,* wouldn't you agree with that?

"A. *I agree with you."* (Emphasis supplied.)

Defense counsel later succeeded in getting Reeves to repeat, "if a person commits a murder on someone, or killed someone—I think that they should be punished in the same fashion." However, Reeves also reiterated her firm belief that "when it comes to the point of making my decision, and tell you yes and yes—my spiritual guidance probably won't let me."

Further voir dire by the trial judge confirmed Reeves' convictions:

"A. Well, I have to be honest, I don't believe I would make a very good juror.

"THE COURT: Why?

"MS. REEVES: Mainly, because this would make a nervous wreck out of me, and I don't know whether I could live with myself then.

"THE COURT: Well, would it effect (sic) your judgment in the matter then, in arriving at the answer as to these questions?

"MS. REEVES: If it came to the point of me saying, 'Yes, that man should be put to death,' you know, and

all the rest of them said, 'Yes, he could be put to death,' like I said, I don't know whether my religious feelings would say, yes, let me put him to death, even if he probably should be. I just really don't think I would be a good juror.

"THE COURT: Would you deliberately answer one of the questions no, to avoid that situation, regardless of the evidence?

"MS. REEVES: Well, I still feel like if he would be a continuing threat to society—

"THE COURT: That's one question.

"What about both questions? You have to answer both of them yes, or one no.

"My question is: *Would you, regardless of the evidence, answer one of them no to avoid the consequences of the death penalty?*

"MS. REEVES: *I don't know whether I would or not.*

"THE COURT: You are the only one who would know.

"What do you think you would probably do, speaking of probabilities?

"MS. REEVES: If I heard all the evidence, and I knew it was very severe, I will probably say give him the death penalty.

"THE COURT: In other words, your conscience would allow to you answer both questions yes?

"MS. REEVES: *At this moment, yes, but, like I said, when it comes right down to saying put that man to death—*

"THE COURT: We are not doing that now. We are trying to find out if you're structured to do that in a proper case. In a proper case, is where you are convinced beyond a reasonable doubt the answer should be yes on both those questions.

"MS. REEVES: *I don't know whether my structure would let me. Because of my religious feelings.*

"THE COURT: If I understand correctly, then, what you are telling me is the fact the death penalty is a possibility in this case is going to influence your judgment in the matter.

"Is that a correct statement?

"MS. REEVES: What, sir?

"THE COURT: *Because of the way you feel about the death penalty, and because the death penalty is a possibility in this case, that is going to influence your judgment in this case?*

"MS. REEVES: *Yes, it would influence my judgment."* (Emphasis supplied.)

The court sustained the State's motion to exclude Reeves from the jury.

■■ We find that veniremember Reeves was properly removed for cause, since it was shown that her subjective views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. See *Wainwright v. Witt,* supra, 105 S.Ct. at 852. Reeves agreed with the trial judge and the prosecutor that her personal feeling would influence her and would prevent or substantially impair her judgment. Although Reeves frequently conceded that she *personally* favored the death penalty in certain cases, she could not resolve her religious conflict with respect to being involved in assessing the punishment of death.

Appellant's first contention is overruled.

With respect to juror Anna Weiss appellant argues that she was shown to be a biased juror who should have been excluded from the jury.[1] Weiss testified that she worked for the Galveston Police Department as a police dispatcher five years prior to the time of trial in the instant case. The

---

1. Although appellant does not refer this Court to a specific statute, Article 35.16(a)(9), V.A.C.C.P., reads in relevant part:

"(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

\* \* \* \* \* \*

"9. That he has a bias or prejudice in favor of or against the defendant."

record also shows that Weiss knew several police officers, including those scheduled to testify at trial.

"Q. [Defense Counsel] How do you feel sitting on a jury where people you have known in the past are going to testify in a situation you have to judge them, or trust them with somebody's life hanging in the balance?

"A. I feel like I could trust their statements, especially knowing their background.

"Q. All right. You think that would be a natural tendency, because you worked with the people before?

"A. Yes.

"Q. How about Officer Ed Albro? Do you know him?

"A. Yes.

"Q. And Officer Harry Milo?

"A. Yes.

"Q. You would feel the same way about all the people, feel automatically they are trustworthy people?

"A. Yes.

\* \* \* \* \* \*

"Q. Tell me what you think about the people I have named.

"*Here's a point.*

"*Are you sort of automatically going to assume these people are telling the truth*?

"A. *No.*

"Q. I am having trouble understanding, because I thought a moment ago, basically—I forget the words you used, but something to the effect you probably felt like all these people were telling the truth, based on past experiences.

"A. Yes.

"Q. If one of them told you an incredible story, would you recognize it as incredible?

"A. Yes.

"THE COURT: Would you? If one of them told you a story that was incredible?

"MS. WEISS: Yes. No.

"THE COURT: Would you recognize it as being incredible?

"MS. WEISS: No.

"THE COURT: *Would you automatically believe whatever they told you was true?*

"MS. WEISS: *No.*

"THE COURT: *In other words, you wouldn't give them any particular credence?*

"MS. WEISS: *No.*

"THE COURT: *Judge them same as any other witness?*

"MS. WEISS: *Right.*" (Emphasis supplied.)

Although Weiss initially admitted she had no reason to disbelieve the testimony of officers she had formerly worked with, she also testified that she could serve as a fair and impartial juror without bias toward the prosecution.

"Q. I want to project your mind ahead in time, and tell me whether or not you think, and we have to know now, not later on, I want you to think about it once more, and tell me if you are sure you can be a fair, impartial juror, or any possibility your experience or contact with the police department might tend to influence your judgment one way or the other? It would work both ways.

\* \* \* \* \* \*

"A. *Yes.*

"Q. So could make you a pro or against the Prosecutor?

"A. Yes.

Q. And I know you are thinking hard.

"A. Yes.

"Q. And now is the time to know.

"A. Well, I know I am—*I know I know these faces, and I feel like I could judge a person just by looking at the facts, and the case.*

"But, I know it's slightly against my favor—

"MR. JAMES: I can't hear you.

"MR. STEVENS: Me neither.

"A. I guess I have more negative—

"THE COURT: You know the faces of the police officers?

"Q. (By Mr. Stevens) Does that mean that the Defendant in this matter, it's

going to start out, so to speak, has one strike against him, in your mind?

"A. *Oh, no.*

"Q. In the sense the police would be one strike ahead, because you have an opinion about their honesty?

"A. *No. No.*" (Emphasis supplied.)

Appellant's challenge for cause was based on the following testimony:

"Q. * * * What kind of thoughts are going through your head whether you will have problems in the jury room?

"A. I don't think I will.

"Q. * * * My question is: Would you have a temptation to do so, in part, because you don't want to be in a position of seeing the police officers you have worked with before? Any thoughts like that going through your mind back in the jury box?

"We need to know now.

"A. Yes.

"Q. What do you think?

"A. No.

"Q. You don't think so?

"MR. JAMES: Objection, asked and answered.

"THE COURT: *Would that be in your mind?*

"MS. WEISS: *Knowing the police officers.*

"THE COURT: *Yes, would that influence your service as a juror?*

"MS. WIESS (sic): *Yes, I guess it would.*

"MR. STEVENS: At this time we will challenge for cause, and both for that and prior testimony, the nature of the capital offense would effect the nature of deliberations as a juror." (Emphasis supplied.)

Given Weiss' response, it would appear that appellant's challenge for cause was justified. However, the prosecutor effectively rehabilitated Weiss by asking the following questions:

"Q. Miss Weiss, I will not beat a dead horse.

"I just want to know, can you put aside your knowledge of the police of-

ficers, and base your verdict on the evidence that you hear?

"A. *Yes.*

"Q. And could you put aside any of your knowledge of those police officers, and judge them on the same basis as you would anybody else?

"A. *Yes.*

"Q. You wouldn't have any trouble doing any one of those things, would you?

"A. *No.*" (Emphasis supplied.)

Appellant's trial counsel renewed his challenge to Weiss and requested an additional peremptory strike "based upon the resistance of this juror in answering questions concerning the police department." Appellant's request was denied, and consequently Weiss became an alternate juror. She became a member of the jury panel when another juror was excused on the day of trial.

This Court has held that when a prospective juror is shown to be biased as a matter of law, he *must* be excused when challenged, even if he states that he can set his bias aside and provide a fair trial. *Clark,* supra, at 917; *Anderson v. State,* 633 S.W. 2d 851, 854 (Tex.Cr.App.1982); *Williams v. State,* 565 S.W.2d 63, 65 (Tex.Cr.App.1978); *Hooper v. State,* 100 Tex.Cr.R. 147, 272 S.W. 493, 495 (1925). "However, it is left to the discretion of the trial court to first determine whether or not bias exists." *Anderson,* supra, at 854. The trial court's decision to overrule a challenge for cause must be reviewed in light of *all* the answers that the prospective juror gives. *Clark,* supra; *Anderson,* supra; *Brown v. State,* 692 S.W.2d 146, 149 (Tex.App.-Houston [1st] 1985, PDR granted). The Supreme Court has also determined that appellate review of voir dire proceedings "does not end with a mechanical recitation of a single question and answer." *Wainwright v. Witt,* supra, 105 S.Ct. at 852; see also *Darden v. Wainwright,* supra, 106 S.Ct. at 2469.

In *Sawyers v. State,* 724 S.W.2d 24 (Tex. Cr.App.1986), this Court recently addressed this very issue and held that veniremember

Meadows' bias was established as a matter of law.

"Our reading of the voir dire establishes that although Meadows initially hesitated in giving a firm answer as to whether her deliberations would be affected by a police officer's testimony, by the end of the voir dire examination, she clearly and unequivocally affirmed that she could not clearly and fairly evaluate the testimony of a police officer, and thus was properly excused for cause." *Sawyers,* supra, at 32.

An opposite result was reached in *Cordova v. State,* 733 S.W.2d 175 (Tex.Cr.App. 1987). Veniremember Kucera initially stated that he did not know of any reason why he could not be a fair and impartial juror and that he could follow the statutory scheme in answering the special issues if the defendant was found to be guilty of capital murder. Kucera also testified that he lived in a neighborhood that had experienced a rash of burglaries and that the city police were undependable. Kucera was challenged for cause by the defense attorney when he admitted that he could not be a fair and impartial juror due to his experiences. The challenge was denied after Kucera testified that he "believed" that he could be a fair and impartial juror.

This Court held:

"We find that the voir dire examination of Kucera taken as a whole does not reflect or indicate that Kucera had any personal feelings against appellant, who he testified he did not know. He never stated that he would hold appellant responsible, either directly or indirectly, for what had occurred in his neighborhood, or that he would consider what had occurred in his neighborhood in deciding appellant's guilt or the answers to the special issues, or that he would not follow the law as given by the trial judge in deciding guilt or the special issues on punishment." *Cordova,* 733 S.W.2d at 180.

*Taken as a whole,* Kucera's testimony did not reflect that he was disqualified as a matter of law from serving on the jury.

In the instant case juror Weiss at one point clearly testified that she thought her acquaintance with the police officers would influence her service as a juror. However, there was frequent testimony to the effect that Weiss could serve as an impartial juror. She stated that she would not "automatically" assume the officers would tell the truth, that she could judge their credibility just as any other witness', and that the police would not "be one strike ahead" because of her opinion as to their veracity. Finally, Weiss stated point blank that she could put aside her knowledge of the police officers and base her verdict on the evidence presented.

■ This case is clearly distinguishable from *Sawyers,* supra, and *Hernandez v. State,* 563 S.W.2d 947, 950 (Tex.Cr.App. 1978), in which veniremember Abel testified she believed a police officer would always tell the truth. Abel's predisposition to believe police officers would have prevented her from impartially judging the credibility of those witnesses and amounted to impermissible bias against the defendant. The veniremember's bias shown in *Hernandez,* supra, was particularly relevant since three of the four State's witnesses were police officers. In the instant case no police officer testified during the guilt-innocence phase of trial, and only one officer testified during the punishment phase. Under the circumstances, and in light of *all* the answers provided by juror Weiss, it cannot be said that the trial judge abused his discretion by refusing to sustain appellant's challenge for cause.

■ Furthermore, appellant never lodged a specific objection at trial based on juror Weiss' bias in favor of Galveston police officers. Defense counsel initially challenged Weiss for cause based on her testimony and "the nature of the capital offense would effect (sic) the nature of deliberations as a juror." This challenge was later renewed in similarly imprecise fashion:

"MR. STEVENS: Renew challenge.

"THE COURT: Overruled.

"MR. STEVENS: Further, meaning no disrespect to this potential juror, we

would ask an additional peremptory strike, based upon the hesitance of this juror in answering questions concerning the police department. I think we have clearly put her on the spot, and think it's a factor.

"For that reason, we will ask for an additional peremptory strike.

"THE COURT: Denied.

"MR. STEVENS: Nothing further."

"It has long been the rule that error is not preserved when the error presented on appeal is not the same as the objection raised at trial." *Sawyers,* supra, 724 S.W.2d at 28; see also *Sharp,* supra, at 619; *Phillips v. State,* 701 S.W.2d 875, 881 (Tex.Cr.App. 1985); *Buxton v. State,* 699 S.W.2d 212, 217 (Tex.Cr.App.1985); *Pennington v. State,* 697 S.W.2d 387, 390 (Tex.Cr.App. 1985); *Brown v. State,* 692 S.W.2d 497, 501 (Tex.Cr.App.1985); *Vanderbilt v. State,* 629 S.W.2d 709, 721 (Tex.Cr.App.1981), cert. denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982); *Hall v. State,* 711 S.W.2d 108, 111 (Tex.App.-Houston [14th] 1986).

Appellant's second point of error is overruled.

Appellant combines points of error three through five, which allege that the trial court erred in refusing the requested charge on parole eligibility in the event that appellant received a life sentence.[2] The record reflects that appellant's trial counsel tendered a handwritten "Defend-

ant's Requested Instruction on Punishment" to the trial court at the punishment phase, requesting the following instructions to the jury:

"Under the law applicable in this case, the defendant, if sentenced to imprisonment for life, may not earn time off the sentence imposed through the award of good conduct time.

"Under the law applicable in this case, if the defendant is sentenced to imprisonment for life, he will not become eligible for parole until the actual time served by him including time served in the Galveston County Jail equals 20 calendar years. Eligibility for parole does not guarantee that parole will be granted."

Appellant's requested instruction was denied.

Appellant complains that while the enactment of Article 37.07, § 4, V.A.C.C.P. (effective September 1, 1985) now entitles convicted felons to have a jury instruction concerning their parole eligibility, the same instruction is not afforded persons convicted of capital murder. Under that article, if punishment is assessed by the jury in a felony case, "unless the defendant has been convicted of a capital felony," the court must include language set out in the statute relating to the possibilities for parole as well as good conduct time credits. See *Casares v. State,* 712 S.W.2d 818, 821 (Tex.App.-Houston [1st] 1986). The pertinent portion of Article 37.07, § 4(a), reads:

---

2. Appellant's last three points of error read: "POINT OF ERROR NUMBER THREE THE TRIAL COURT ERRED IN REFUSING THE REQUESTED CHARGE REGARDING APPELLANT'S PAROLE ELIGIBILITY, IF A LIFE SENTENCE WERE ASSESSED, IN THAT ANY OTHER PERSON CONVICTED OF A FELONY AND SENTENCED BY A JURY IS ENTITLED TO HAVE THE JURY INSTRUCTED REGARDING HIS PAROLE ELIGIBILITY, THUS APPELLANT WAS DENIED EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION 14TH AMEND. AND THE TEXAS CONSTITUTION ART. I SECTION 3.

"POINT OF ERROR NUMBER FOUR THE TRIAL COURT ERRED IN REFUSING THE REQUESTED CHARGE REGARDING APPELLANT'S PAROLE ELIGIBILITY, IF A LIFE SENTENCE WERE ASSESSED, IN THAT THIS INSTRUCTION IS NECESSARY

TO GUIDE THE JURY IN ANSWERING SPECIAL ISSUE NUMBER 2.

"POINT OF ERROR NUMBER FIVE THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE PAROLE LAWS OF THE STATE OF TEXAS DURING THE PUNISHMENT PHASE OF THE TRIAL AND IN DOING SO DENIED APPELLANT HIS RIGHTS OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 19 OF THE TEXAS CONSTITUTION AND CAUSED THE IMPOSITION OF THE DEATH PENALTY HEREIN TO VIOLATE HIS RIGHTS TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 13 OF THE TEXAS CONSTITUTION."

"4(a) * * *

"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the sentence imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

"It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-third of the sentence imposed or 20 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than six years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

"It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

"You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant."

Appellant argues that the jury in a capital murder trial should be instructed that the "black letter" law says a defendant will not become eligible for parole consideration until twenty calendar years have passed.

Appellant's contention was recently addressed in *Andrade v. State*, 700 S.W.2d 585 (Tex.Cr.App.1985), cert. denied, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986). Andrade alleged that the trial court "erred in refusing to instruct the jury on the parole laws of the State of Texas during the punishment phase of the trial," arguing that the jury must fully know what alternatives are available short of the death penalty. *Andrade*, supra, at 587. Andrade's requested instruction read: "You are instructed that a person convicted of Capital Murder is not eligible for parole until he has served at least twenty calendar years...." *Id.* In upholding the exclusion of Andrade's instruction, we cited *Williams v. State*, 668 S.W.2d 692 (Tex.Cr. App.1983), which held that no error resulted from a charge which instructed the jury at the punishment stage *not* to consider how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

Appellant urges us to "revisit *Andrade v. State*," since Article 37.07, § 4, was enacted after *Andrade* was decided. However, said article applies only to felony cases and not to capital felonies. Because the recent enactment of section 4(a) specifically excludes the possibility of instructing jurors in capital cases about parole eligibility, it is obvious that the Legislature did not intend for such instructions to be given during the punishment phase in capital cases. The entire sentencing structure and punishment scheme in capital cases has always been different from the sentencing procedure in non-capital cases, and the Texas death penalty statute has been held constitutional. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Furthermore, the special procedures applied in capital cases under Article 37.071, V.A.C. C.P., are not unconstitutionally invalid based on equal protection violations. *Phillips v. State*, 701 S.W.2d 875, 894 (Tex.Cr. App.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986); *Johnson v. State*, 691 S.W.2d 619, 624 (Tex.Cr.App. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985). Appellant was not denied equal protection or due process

of law by the trial court's refusal to grant his requested charge on parole eligibility.

■ Appellant also argues that the instruction on parole eligibility is necessary to guide the jury in answering the second special issue under 37.071(b)(2), V.A.C.C.P. However, if it is clear that Article 37.07, § 4(a), does *not* apply to capital felonies, then it is also clear that jurors in capital cases should focus solely on the special issues submitted to them during the punishment phase. "In fact, advising jurors that a life penalty is theoretically modifiable, and thus not 'final,' might incline them to approach their fact finding duty with less appreciation for the gravity of the answers to the submitted questions and for the moral responsibility reposed in them as fact finders." *Andrade,* supra, at 590 (J. Teague, concurring) Since jurors do not actually "sentence" a defendant in Texas capital cases, their attention should be directed only to answering the special issues without regard to the sentence that will ultimately be imposed.

Appellant's final points of error are overruled. The judgment is affirmed.

DUNCAN, J., not participating.

TEAGUE, Judge, dissenting.

Finding that I am unable to agree with the conclusion that the majority opinion reaches, that the trial judge did not err in excusing prospective venireperson Evelyn Reeves, I am compelled to file this dissenting opinion.

The record makes it clear that the State did not verbalize any challenge for cause to Reeves and the trial court did not articulate any reason why he was excusing Reeves. Article 35.16(a), V.A.C.C.P., expressly provides that "A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury." Therefore, the excusal of Reeves should be decided on the basis of whether the trial judge improperly excused Reeves on his own motion, and not decided on whether the State properly challenged Reeves for cause.

A clear, rather than selective, reading of Reeves' voir dire examination does not reflect or indicate to me that Reeves had such a fixed opinion regarding the death penalty that would have rendered her unfit to serve as a juror in this cause. In fact, a clear reading of her testimony only reflects that at the extreme Reeves was actually a conscientous person who I find, because of the strength of her convictions, would have been able both to fairly and impartially decide appellant's guilt and answer the special issues. See and compare Circuit Judge Gee's comments that he made on behalf of a panel of the Fifth Circuit and the En Banc Court in *Burns v. Estelle,* 626 F.2d 396 (5th Cir.1980); *Burns v. Estelle,* 592 F.2d 1297 (5th Cir.1979).

If it is the will of the Supreme Court of the United States that only persons similar to the likes of Adolph Eichmann and Josef Mengle are qualified to serve on capital murder cases, so be it. However, given the fact that a majority of the Supreme Court just recently in *Gray v. Mississippi,* —— U.S. ——, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), reaffirmed *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), which held that the exclusion for cause of only one juror with general objections to the death penalty renders the death sentence invalid, I do not believe that even the aggressive and assertive majority of that Court is actually ready for that day. In any event, as a matter of Texas constitutional law, I, for one, am certainly not ready for that day.

I respectfully dissent to the majority opinion's improperly overruling appellant's first point of error.