**Affirmed and Opinion Filed July 26, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00639-CR**

**VICENTE BARRUETA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F11-70647-J**

## OPINION

Before Justices FitzGerald, Francis, and Lewis
Opinion by Justice FitzGerald

A jury found appellant Vicente Barrueta guilty of aggravated sexual assault of a child under the age of six and assessed punishment at eighty years' imprisonment. On appeal, appellant challenges the sufficiency of the evidence, the correctness of the jury charge, and the admission of his oral and written statements following his arrest. We affirm.

### I. BACKGROUND

In the indictment, the State alleged that appellant sexually assaulted the complainant on or about February 10, 2011 by causing his sexual organ to contact and penetrate the complainant's anus. The evidence showed that the complainant was a five-year-old girl at the time of the alleged assault and appellant was twenty-three-year-old man. The complainant's mother, Silvia Torres, was a friend of appellant's mother, Martina Solorzano, and they lived in

the same apartment complex about a block apart. Appellant lived with his parents, his older brother Lazaro, and his younger brother Santiago, who was about the complainant's age. Torres worked with appellant's parents at night, cleaning offices. On February 10, 2001, Torres went to work with appellant's parents and left her daughter, the complainant, with Lazaro, appellant, and Santiago. The complainant was asleep when Torres picked the complainant up around midnight.

Torres testified that the complainant made an outcry the next afternoon and said that appellant had assaulted her. After being arrested, appellant was interviewed by the police on April 13, 2011, and he gave oral and written statements. He was then indicted for aggravated sexual assault of a child under six years of age. He pleaded not guilty, and he elected to have punishment assessed by the jury. The jury found him guilty and assessed punishment at eighty years' imprisonment. The judge rendered judgment in accordance with the jury's verdict, and appellant timely appealed.

## II. ANALYSIS

Appellant raises five points of error on appeal. In his first point of error he challenges the sufficiency of the evidence. In his second, third, and fourth points of error he complains of jury-charge error. And in his fifth point of error he challenges the admissibility of his post-arrest statements to the police.

### A. Sufficiency of the evidence

#### 1. Standard of review

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and decide whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Haywood v. State*, 344 S.W.3d 454, 458–59 (Tex. App.—Dallas 2011, pet. ref'd). In this case, the elements of the offense are that appellant intentionally or knowingly caused his sexual organ to contact or penetrate the

complainant's anus at a time when the complainant was younger than six. *See* TEX. PENAL CODE ANN. § 22.021(a), (f) (West 2011). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). The testimony of the victim, even a child victim, is sufficient to support a conviction for sexual assault. *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

### 2. Evidence supporting the conviction

The complainant, who was six years old at the time of trial, testified to the following facts. She testified that when she was at "Santiago's house," she was playing hide-and-seek when "something bad" happened. She went into the bathroom, and appellant also went into the bathroom. Appellant closed and locked the door. Appellant pulled the complainant's clothes down and pulled his own clothes down, and he touched her. When asked where appellant touched her, she replied, "In my bottom." Using drawings of a naked boy and girl, the complainant explained that appellant touched her bottom over her clothes with his hand and underneath her clothes with his penis. Using anatomically correct dolls, she also demonstrated that appellant touched her anus with "his private." Appellant stopped when Santiago tried to open the door. The complainant put her clothes back on and left the bathroom crying. She testified that she told her mother about the incident the next day after school. On cross-examination, the complainant was asked how she knew that appellant touched her bottom underneath the clothes. She replied that she could feel it and that it felt hot.

The complainant's mother, Torres, testified as follows. When she went to work the afternoon of February 10, 2011, she dropped the complainant off at appellant's apartment. Appellant, Lazaro, and Santiago were there. Torres picked the complainant up after work at around midnight. The complainant was asleep at the time and appeared to be okay. After the

complainant got home from kindergarten the next day, the complainant told Torres that appellant had taken her into the bathroom and touched her behind "with his part here." The complainant demonstrated what she meant by "his part" by pointing to herself in such a way that Torres understood her to mean appellant's penis. The complainant also told Torres that appellant "laid her down on the floor" and "her head [was] hitting against the bottom of the toilet." Torres testified that she took the complainant to the doctor the next day, and the doctor sent her to "Children's." Before the incident, the complainant was a very open and very independent child who liked to sleep alone. But at the time of trial, she was "scared," distracted in school, and slept holding onto or close to Torres.

A physician's assistant named Shandolyn Story testified that on February 12, 2011, Torres brought the complainant to the family practice clinic where Story worked. When it was clear that there was a possible sexual assault, Story referred Torres to Children's Hospital in Dallas because the clinic was not equipped to deal with a possible sexual-assault case. A pediatric nurse practitioner named Sandra Onyinanya testified that she was working at Children's Hospital on February 14, 2011. Onyinanya examined the complainant on that date. Her examination revealed no unusual findings, but Torres told her that appellant had "laid the child on the bathroom floor" and "proceeded to rub his penis in the hole she poops from."

Dallas Police Detective Glen Slade testified as follows. He is fluent in Spanish. He watched the forensic interview of the complainant and then interviewed appellant after his arrest. He first advised appellant of his rights in Spanish. Appellant signed a card that had his rights printed on it in Spanish, and he agreed to waive his rights and speak with Slade. The interview lasted about forty-five minutes. Slade testified that appellant admitted

> that they were playing hide-and-seek in the bathroom with the light out and that she got on top of him and aroused him, and they were both wearing shorts and that he admitted several times that his penis had made contact, and he one time even admitted that it penetrated her anus.

The trial judge admitted a DVD recording of the interview into evidence, as well as an English transcript of the interview. Appellant also made a handwritten statement during the interview, and the trial judge admitted the statement and an English translation of the statement into evidence. The English translation of appellant's statement says:

> We were taking care of [the complainant] at my apartment. We were playing hide and go seek. We went to the bathroom with [the complainant]. We started to play she climbed on top of me hard and that is why I got excited. She lowered the pants a little and that is why there was a little bit of contact, a thin pair of shorts, her butt with my penis. We were sitting on the floor. I feel very bad because it was a game a stupidity.

Slade had no other involvement in the case after the interview.

Appellant testified at trial. During his testimony, he admitted that he told Slade that he put his penis "inside of her butt."

### 3. Appellant's argument

Appellant argues that the evidence was insufficient to support his conviction for a host of reasons. For example, he points out that there was no medical corroboration of the alleged sexual abuse. When the complainant received a medical examination four days after the alleged assault, there were no abnormal findings of any kind. Appellant also points out that the complainant's therapist after the incident testified that the complainant said that appellant never gave her any presents, which would suggest that appellant did not "groom" the complainant in preparation for assaulting her. Appellant speculates that the complainant may have been assaulted instead by a man who was living with her and the complainant's mother.

Appellant's older brother Lazaro testified that he was in his bedroom that evening and that he heard his little brother Santiago counting "one, two, three, four." Although the door to his bedroom was closed, he could hear what was going on outside and could hear footsteps outside his room. But he never heard a noise like "a head hitting a toilet bowl or seat in the rest room." There was evidence that Lazaro's bedroom and the bathroom in question were very close

together, further suggesting that he would have heard something if the complainant's accusations were true. Torres herself testified that Lazaro was a very good and responsible person.

Appellant points to evidence that he argues undermines the complainant's credibility. For example, the complainant testified that she did not scream during the assault, and when asked why she didn't scream, she replied, "I don't know, but I didn't want to scream." Appellant argues that complainant's failure to scream is inconsistent with his guilt, because the complainant knew that Lazaro was in the apartment quite nearby. Appellant argues that the complainant was troubled and vulnerable to manipulation by her mother, and in support he relies on the complainant's testimony that she missed her father, who did not live with her and her mother, and on testimony that the complainant had problems with bed-wetting and "[a] bit" of an unspecified eating disorder. Appellant also contends that the complainant's allegations were too detailed and mature to have originated with a five-year-old, that the complainant was predisposed to go along with false allegations because she was assertive and liked to talk, and that the complainant underwent counseling and consultations with the prosecution that involved repeating the allegations.

Appellant attempts to undermine Torres's credibility in a couple of ways. He points out that there was some evidence that Torres continued to associate with appellant's mother for at least a few weeks after the incident. He also argues that the evidence suggested that there was a romantic relationship between Torres and appellant, that Torres would not have wanted to admit that relationship (apparently to appellant's parents), and that Torres therefore had a motive to have appellant "removed from her life by having him arrested." For example, Torres testified that she talked to appellant on the phone the day after the incident, and appellant said something to the effect of, "You have not given me anything and I have given you things," and, "You have not given me any gifts." Torres also testified that before the incident, appellant tried to hold her

hand and hug her, but she said no. She also testified that appellant took her and perhaps the complainant to the park twice, and that appellant also took her to work an unspecified number of times.

Appellant testified at trial and denied that his penis ever contacted any part of the complainant's rear.

### 4. Application of the law to the facts

We reject appellant's challenge to the sufficiency of the evidence. The points appellant makes about the evidence involve, at most, weight and credibility determinations that the jury was entitled to resolve against him.

The jury was entitled to credit the complainant's and her mother's testimony against appellant. *See Merritt*, 368 S.W.3d at 525 ("The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses."). Whether the complainant's testimony was unbelievably mature for a child her age or had been coached by repetition was for the jury to decide. It was also for the jury to decide whether the complainant's mother's testimony was influenced by any kind of bias against appellant. Although there was no medical evidence of the assault, the State did put on evidence that anal tissue both is capable of dilation and heals quickly, and it was "absolutely possible" for a young child to be anally penetrated by an adult man and still have normal findings in a medical examination. The State also put on evidence that not all sexual assailants "groom" a child victim with presents and special attention before committing an assault. Some sexual assaults are simply crimes of opportunity. It was up to the jury to weigh all this testimony. It was also the jury's prerogative to assess the significance of Lazaro's testimony that he apparently heard nothing during the alleged assault, and the probative value of appellant's statements in his interview with Detective Slade. And of course it was the jury's province to assess appellant's credibility when he testified.

We conclude that the evidence was sufficient to support the jury's verdict, and we overrule appellant's first point of error.

## B.     Jury-charge error

Appellant's second, third, and fourth points of error concern alleged errors in the jury charge for the punishment phase of the trial. Appellant did not object to the jury charge. Accordingly, in this appeal we determine first whether the jury charge was erroneous. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If it was, we reverse only if the error was so egregious and created such harm that it denied appellant a fair and impartial trial. *See id.* In assessing harm, we may consider (1) the charge itself, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the record. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

### 1.     Parole

Appellant complains of the following instruction in the punishment jury charge:

> You are further instructed that in determining the punishment in this case, you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.

In his second point of error, appellant argues that this instruction was erroneous because he was not eligible for parole. *See* TEX. GOV'T CODE ANN. § 508.145(a) (West 2012). The State agrees that appellant was not eligible for parole, but the State contends that the instruction was not erroneous or, alternatively, that the instruction did not cause egregious harm.

Appellant argues that the instruction was erroneous under article 37.07 of the Texas Code of Criminal Procedure, contending specifically that section 4(a) of that article required the trial judge not to give any instructions regarding parole. Section 4(a) provides a four-paragraph set of

instructions about "good conduct time" and parole that the trial judge "shall" give the jury if the defendant has been convicted of certain offenses, "unless the defendant has been convicted of . . . an offense under Section 22.021, Penal Code, that is punishable under Subsection (f) of that section." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (West 2012). Appellant was convicted under section 22.021 and was punishable under subsection (f) of that section, so the section 4(a) instructions were not required. But, as the State points out, the trial judge did not give the jury the four-paragraph section 4(a) instruction. Rather, the trial judge gave the jury the two-sentence instruction quoted above, which is not found in section 4(a). Thus, the instruction was not erroneous under section 4(a) for the simple reason that section 4(a) says nothing about the actual instruction used by the trial judge.

Appellant also argues that the instruction was erroneous by analogy to *Hill v. State*, 30 S.W.3d 505 (Tex. App.—Texarkana 2000, no pet.), and *Navratil v. State*, No. 05-97-01404-CR, 2001 WL 92688 (Tex. App.—Dallas Feb. 5, 2001, pet. ref'd) (not designated for publication). In each of those cases, the trial judge erroneously instructed the jury that the defendant's "good conduct time" would count towards the time the defendant had to serve before becoming eligible for parole, when under the law good conduct time actually did not count. *Hill*, 30 S.W.3d at 507; *Navratil*, 2001 WL 92688, at \*2. And in each case, the court of appeals reversed, holding that the error caused egregious harm. *Hill*, 30 S.W.3d at 508–09; *Navratil*, 2001 WL 92688, at \*3–4. The State distinguishes *Hill* and *Navratil*, pointing out that those cases involved jury charges that affirmatively misstated the law. In the instant case, by contrast, the instruction in question does not misstate the law, but rather instructs the jury "not to discuss . . . how long the defendant will be required to serve any sentence" imposed. Moreover, the court of criminal appeals has considered instructions similar to the one in this case and consistently held that their submission was not an abuse of discretion. *E.g.*, *Janecka v. State*, 739 S.W.2d 813, 833 (Tex. Crim. App.

1987) (per curiam) (capital murder case); *Williams v. State*, 668 S.W.2d 692, 701 (Tex. Crim. App. 1983) (same); *Freeman v. State*, 556 S.W.2d 287, 304 (Tex. Crim. App. 1977) (same). We conclude that the instruction in question did not misstate the law and was not erroneous. Appellant was not eligible for parole, but the instruction did not tell the jury that he was. The instruction instructed the jury not to consider how long appellant would actually serve the sentence the jury imposed, and that that question was solely for the Board of Pardons and Paroles. Appellant acknowledges that pardon was theoretically possible. The instruction was not erroneous.

Alternatively, assuming that the instruction was erroneous because it somehow implied that appellant was eligible for parole, we conclude that the harm to appellant was not egregious. We keep in mind the presumption that the jury understood and followed the court's charge absent evidence to the contrary, *Crenshaw v. State*, 378 S.W.3d 460, 467 (Tex. Crim. App. 2012), and that the instruction told the jurors not to discuss how long the defendant would actually serve. The instruction was not emphasized in the punishment jury charge in any way. The evidence included appellant's denial of the offense, which the jury rejected; thus, the jury was entitled to consider that appellant refused to take responsibility for his actions in assessing his punishment. Parole was not mentioned in punishment closing arguments, and the jury did not send out any questions about parole during deliberations. Although the punishment assessed by the jury, eighty years' imprisonment, was lengthy, it was short of the maximum punishment it could have imposed, and the crime of sexual assault on a five-year-old girl was heinous. Given all these factors, we conclude that any harm to appellant was not egregious.

In so concluding, we distinguish *Navratil*, in which we held that an affirmatively and legally incorrect jury instruction about parole eligibility caused egregious harm. In *Navratil*, we emphasized that our holding of egregious harm depended on the presence of an "absolute

misstatement of the law" in the jury charge. 2001 WL 92688, at *3; *see also id*. at *4 ("The jury was absolutely misinformed as to how the parole laws and good conduct time work, particularly with respect to this defendant."). The instruction in this case was not affirmatively incorrect. At most, it might have suggested to the jury that appellant was eligible for parole or pardon, when in fact he was not eligible for parole. For the reasons stated above, we conclude that any harm caused by the instruction was not egregious.

We overrule point of error two.

### 2. Pardon

In his third point of error, appellant attacks the same jury instruction that he attacks in his second point of error, but for a different reason—he contends that the instruction was misleading because the possibility that he will be granted a pardon is "infinitesimal." For factual support, he relies on news reports to establish the number of inmates incarcerated in Texas and the number of pardons the current governor has granted based on innocence in aggravated sexual assault cases. But as the State points out, we may not consider these factual assertions based on evidence not in the record. *See Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court may not consider factual assertions that are outside the record . . . .") (footnote omitted). Appellant acknowledges that the pardon laws were "theoretically applicable" to his case, and that the Board of Pardons and Paroles could recommend clemency to the governor.

We reject appellant's contention that the instruction was erroneous or misstated the law simply because the likelihood that appellant would be pardoned may be low. Assuming the instruction implied that it was possible for appellant to be pardoned, it was correct. We overrule appellant's third point of error.

–11–

### 3. Cumulative error

In his fourth point of error, appellant contends that the jury instruction discussed above caused harmful error because it both erroneously implied the applicability of parole law and referenced pardon law even though pardon was very unlikely. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect."). Cumulative error is inapplicable here, since the instruction was only a single error if it was error at all. Moreover, we have concluded that the instruction was not erroneous, and that if it was erroneous with reference to the parole-law issue, it did not cause egregious harm. We accordingly also reject appellant's cumulative-error argument and overrule his fourth point of error.

## C. Admission of appellant's written and videotaped statements

In his fifth and final point of error, appellant argues that the trial judge erred by denying appellant's motion to suppress and by admitting appellant's written and videotaped statements. Appellant and Detective Slade testified about the circumstances of those statements outside the presence of the jury, after which the trial judge denied the motion to suppress. The judge also signed findings of fact and conclusions of law in support of her ruling. She found, among other things, that appellant's statements were voluntarily made.

### 1. Standard of review and applicable law

We review the trial judge's determination as to the voluntariness of a confession under an abuse-of-discretion standard. *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007). This is a bifurcated standard of review under which we give almost total deference to the trial judge's determination of historic facts and any mixed questions of law and fact that depend on the credibility of witnesses, but we give de novo review to pure questions of law and mixed

questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). The court of criminal appeals has identified three distinct legal theories under which a statement can be ruled involuntary and thus inadmissible: (1) general involuntariness under article 38.22, section 6 of the code of criminal procedure, (2) *Miranda*, as expanded in sections 2 and 3 of article 38.22, and (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). This case involves the first *Oursbourn* theory of involuntariness. That theory can involve police overreaching, but police overreaching is not essential to the claim. *Id*. at 172. Factors that could be relevant to a general-voluntariness inquiry include illness, intoxication, effects of medications, youth, mental retardation, and threats. *Id*. at 170–73. These factors are usually not enough, by themselves, to render a statement inadmissible. *Id*. at 173; *see also Leza v. State*, 351 S.W.3d 344, 352–53 (Tex. Crim. App. 2011) (upholding trial court's conclusion that confession was voluntary even though some evidence showed defendant injected heroin just before his arrest).

When a defendant presents evidence raising a voluntariness question, the State must controvert that evidence and prove voluntariness by a preponderance of the evidence. *State v. Terrazas*, 4 S.W.3d 720, 725 (Tex. Crim. App. 1999). The State is not put to its burden unless the defendant presents evidence that raises a voluntariness question. *Id*. A confession is involuntary if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will. *Morales v. State*, 371 S.W.3d 576, 583 (Tex. App.— Houston [14th Dist.] 2012, pet. ref'd).

## 2. The evidence and findings

Before the jury was sworn, the trial judge held a hearing on appellant's motion to suppress. Detective Slade interviewed appellant in Spanish, and the judge considered a certified English translation of the interview. The interview was videotaped, and it is not clear from the record whether the trial judge watched the video of the interview or not. Detective Slade and appellant both testified at the motion-to-suppress hearing.

Slade testified that he learned to speak Spanish through a two-month training course at Brigham Young University and through living in Chile for a year and a half. He has spoken Spanish since 1982. He is also married to a Mexican woman, and they speak Spanish in the home. He conducted the interview of appellant in Spanish, and he advised appellant of all his rights. Appellant also read his rights printed on a card in Spanish. Appellant indicated that he wanted to waive his rights, and he agreed to speak with Slade. Slade also testified that he never directly promised appellant anything for his statement and that he did not coerce or threaten appellant in any way. Appellant said more than once that he understood the seriousness of the crime he was charged with. Appellant made a written statement during the interview after being advised of his rights again and agreeing to waive his rights. On cross-examination, Slade said he did not recall that appellant seemed dazed or slow to respond to his questions; he testified that appellant was "lucid." Appellant's counsel brought out during cross-examination that Slade used the Spanish word meaning "to pass on" for "waive" when he interviewed appellant, and Slade further explained, "That's as close a literal translation as you can get." Slade agreed that appellant's written statement shows "a very poor command of Spanish." On redirect examination, Slade testified that he talked to appellant for forty-five minutes, that appellant indicated that he was understanding what Slade was saying, and that appellant answered his questions in a way that made sense in the context of what Slade was asking him.

–14–

Appellant testified that he got two hours of sleep the night before he was arrested and interviewed, and that he also slept a little bit before he was arrested that afternoon. He testified that he also fell asleep at the police station. When he was taken to the interview room, he felt very dizzy, nauseated, and faint. He further testified that he did not understand his rights, and that he had no idea why he initialed the card that spelled out his rights. He did not understand what Slade meant by the word "waive." He also testified that Slade indicated that writing a statement would be of some benefit to appellant before the grand jury. On cross-examination, appellant testified that he did not understand what Slade was asking him and that he did not understand Slade's Spanish. When asked how he was able to answer Slade's questions, appellant answered, "I have no idea."

The trial judge denied the motion to suppress. She made written findings, including findings that Slade was able to converse fluently in the Spanish language, that appellant understood his rights and voluntarily waived the right to remain silent, and that appellant's statements were voluntarily made. She also found that there was "no indication or evidence of mental disease or defect that made [appellant] unable to understand his statutory or constitutional rights."

### 3.      Application of the law to the facts

We conclude that the trial judge did not abuse her discretion. Appellant focuses on two matters in arguing that his statements were made involuntarily. First, he argues at some length that Detective Slade's Spanish was very poor and that this "caused misunderstanding in connection with core concerns." Second, he argues that his statements were influenced by his lack of sleep, dizziness, nausea, and feeling faint.

The quality of Slade's Spanish and the degree to which appellant understood Slade's questions were questions of fact for the trial judge to resolve. Slade testified that he was fluent

–15–

in Spanish and testified to facts that would support that conclusion. Slade also testified that appellant indicated that he understood what Slade was saying and that appellant answered his questions in ways that made sense in context. Moreover, the written transcript of the interview also shows that appellant responded intelligibly to Slade's questions. On the other hand, appellant testified that he did not understand Slade's Spanish. The trial judge heard the evidence, observed the witnesses, and found that Slade's Spanish was fluent and that appellant understood his rights and voluntarily waived his right to remain silent. The record supports the trial judge's determination, and we will not disturb it.[1] *See State v. Stevens*, 235 S.W.3d 736, 739–40 (Tex. Crim. App. 2007) ("Courts reviewing a ruling on a motion to suppress afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the determination is based on an evaluation of credibility and demeanor.") (footnote omitted).

We reach the same conclusion as to appellant's claims that he was not feeling well during the interview. Appellant testified that he had not slept much before his interview and that he did not feel well during his interview, but it was the trial judge's prerogative to assess his credibility and believe or disbelieve his testimony. Moreover, during cross-examination, Detective Slade testified that he did not remember appellant's seeming dazed or slow to respond during the questioning. He also testified that appellant was lucid and that part of his training in conducting interviews is ensuring that the interview subjects are of sound mind and are not sick. By finding that appellant's statements were voluntarily made, the trial judge rejected appellant's contention that his physical condition was so grave that he did not make his statements of his own free will. Additionally, as previously noted, matters such as youth, intoxication, and illness are usually not

---

[1] We have assumed in our analysis that the trial judge did not review the video itself in making her determination, but we would reach the same conclusion under the opposite assumption. The video shows Slade and appellant conversing in Spanish. There is no indication in the video that appellant had any difficulty understanding Slade.

–16–

enough by themselves to render a statement involuntary. *See Oursbourn v. State*, 259 S.W.3d at 173. The trial judge did not abuse her discretion by finding that appellant's statements were voluntary despite his alleged sleep deprivation and physical condition.[2]

The record supports the trial judge's denial of appellant's motion to suppress. We overrule appellant's fifth point of error.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.



/Kerry P. FitzGerald/

KERRY P. FITZGERALD
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120639F.U05

---

[2] Again, we have assumed that the trial judge did not review the video itself in making her findings, but we would reach the same conclusion under the opposite assumption. In the video, appellant does not appear to be suffering from any distress.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

VICENTE BARRUETA, Appellant

No. 05-12-00639-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 3, Dallas County, Texas
Trial Court Cause No. F11-70647-J.
Opinion delivered by Justice FitzGerald.
Justices Francis and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of July, 2013.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

–18–